Keith P. AYERS, Petitioner,

v.

Dr. P. J. CICCONE, Director, United States Medical Center for Federal Prisoners, Springfield, Missouri, Respondent.

Civ. A. No. 16855-3.

United States District Court
W. D. Missouri, W. D.

Oct. 7, 1968.

Keith P. Ayers, pro se.

Calvin K. Hamilton, U. S. Atty., Kansas City, Mo., for respondent.

ORDER DISMISSING PETITION
FOR HABEAS CORPUS WITH-
OUT PREJUDICE

BECKER, Chief Judge.

Petitioner, a federal convict confined in the United States Medical Center for Federal Prisoners, Springfield, Missouri, petitions this Court for habeas corpus and for leave to proceed in forma pauperis. Leave to proceed in forma pauperis was previously granted in this cause.

Petitioner stated in his petition that on October 23, 1967, after a plea of guilty to a charge of violating Section 2313, Title 18, U.S.C. (Sale or receipt of stolen vehicles), he was sentenced to a three year term by the United States District Court for the Western District of Kentucky; that he did not appeal the judgment of conviction or the imposition of sentence; and that he was not represented by counsel at his arraignment and plea but was represented by counsel at his sentencing.

Petitioner bases his petition for habeas corpus on the contention that he is being subjected to cruel and unusual punishment by the respondent. To support this contention, petitioner states that he has chronic osteomyelitis of the right foot and left leg; that he has had this disease since December 7, 1961, and has had several operations on both by "bone surgeons"; that on December 22, 1967, he underwent surgery on his foot by the surgeons at the Medical Center; that his foot is better but is very painful; that on February 9, 1968, he underwent surgery on his left leg; that his left leg "was cut open and bone removed from it, [and] the cavity is now the size of a silver dollar and 1½ inches deep directly under [his] left knee cap and the inside of the bone is exposed clearly"; that he consented to both operations and has taken all medicine prescribed by the doctors attending him at the Medical Center; that he suffers from "chronic pain" and "that in his last operation a vital nerve in [his] left leg was so damaged" that he is now unable to use it; that the pain is "unbearable" and because of its intensity he can not eat or sleep; that he has requested "adequate pain medication" from the doctors, but each time he complains the doctors decrease his medication; that his present medication is inadequate to relieve the pain he experiences; and that because of the doctors'

refusal to increase his medication, he has been denied his constitutional right to be free from cruel and unusual treatment.

Some of the facts alleged, if true, may have constituted a denial of petitioner's right to be free from cruel and unusual treatment while confined. Therefore, respondent was directed to show cause why the writ should not be granted.

The response to the order to show cause consists of an affidavit of Dr. John E. Manire, M. D., Chief of Surgery at the Medical Center, which summarized the history and treatment of the petitioner. Attached to this affidavit is a graphic record of medication received by petitioner at the Medical Center from August 8, 1967, through May of 1968. The pertinent portions of the affidavit of Dr. Manire are as follows:

"  *   *   * The patient was admitted to Medical Center on August 8, 1967 and because of pus draining from his left leg and right foot he was placed in the Infections Isolations (sic) Unit. Cultures of the drainage showed the germ staphylococcus aureus, coagulase positive, sensitive to a variety of antibiotics. The patient was placed on an antibiotic to combat the infection and on the analgesic Darvon for pain. Antibiotics were changed from time to time as cultures would indicate. Pain medications were changed, increased or decreased on the judgment of his physicians. In order that a comprehensive view of the antibiotic and pain medications may be obtained, a detailed graph of these medicines is attached as a part of this affidavit. On review of this graph it is quite clear that there are very few days that some analgesic was not available to the patient for pain relief. Chloral Hydrate, a powerful sleeping medication, was available and used almost every night at bedtime since his hospitalization at Springfield.

"On October 20, 1967 this patient was released to court and returned to our care on November 12, 1967. The patient still had drainage from his left leg and right foot and again was placed in our Infections Isolation Unit and given antibiotics for the infection and medications for pain. At times he was on two different antibiotics at the same time and had available to him a choice of two different analgesics at the same time for pain.

"On December 22, 1967 the patient underwent an operation on the right foot in an attempt to eradicate the drainage. Little evidence of diseased bone was found, nonetheless the old schlerotic [sic] layer of bone was removed, but drainage persisted.

"Daily soaks, dressing changes on both right foot and left leg continued along with antibiotics and more powerful analgesics for pain.

"Over the months our orthopedic treatment of this patient was guided by our orthopedic consultants, Dr. William H. Snead and Dr. Erin M. Dillard. However, all operations were performed by Dr. John E. Manire, specialist in general surgery, Chief of Surgery at Medical Center.

"Since drainage continued from the left leg cavity (which was present long before any surgery performed at Medical Center) the patient requested that we operate again. Consultation was again obtained from our orthopedic consultants who advised removal of the upper fibula bone and again scraping out the cavity in the tibia bone. The patient was plainly told that Dr. John E. Manire agreed to do this surgery and that due to the five prior surgical procedures in the same region that the risk of damaging the peroneal nerve that ran around the bone to be removed in this scarred area was extremely great and that no operation should be performed if he were not prepared to accept a foot drop as the price for this surgical attempt to eradicate the drainage from this left leg. He said he fully understood and signed his consent to the operative permit. The surgery was performed under spinal anes-

thesia on February 9, 1968 with the patient awake and talking to the operating surgeon, Dr. Manire, through much of the procedure. There could be no doubt that he knew who was operating on him and he made no protest whatsoever. Unfortunately he did end up with left foot drop which was treated with a foot board just after surgery and later the patient was provided with a short leg drop foot brace with which he walks well.

"Now he did complain of pain in his left leg and foot following this surgery and very careful attention was given to these complaints. As shown on the attached graph in the immediate postoperative period the patient was given Talwin 30 mg. intramuscular every four hours upon request for fourteen days, then this dose was reduced to Talwin 15 mg. intramuscular every four to six hours upon request for the next forty-five days.

"Talwin is an analgesic of major pain relieving quality with a 30 mg. dose of Talwin being equivalent to 10 mg. of Morphine.

"Mr. Ayers (sic) physicians were fully aware of his dissatisfaction with his pain medications as he wrote this to them on several occasions and expressed himself each day on rounds. He also left his 'writ of habeas corpus' at his bedside so that his physicians would see it. He would state that he guessed the only way he would get relief from his pain was to file his writ.

\* \* \* \* \* \*

"Mr. Ayers continued to complain of right foot pains and drainage from the dorsal aspect of this foot. Some moisture reformed in the cavity of his left upper tibia. Again he requested that something operative be done to help him with this condition. Consultation was held with Dr. Dillard, orthopedic consultant. He advised certain procedures on the foot and leg. Mr. Ayers again fully understood and acknowledged that Dr. Dillard did not feel that a 'bone specialist' must do this surgery and that Dr. Manire, Chief Surgeon, Medical Center would do this surgery if Mr. Ayers requested.

"Meanwhile Mr. Ayers complained of pain and bleeding from the left ear with severe headaches and dizziness. He was provided with Codeine for pain relief, ear drops for his ear and seen by an ear specialist who in essence found little wrong with his ear. The specialist ordered additional ear drops which were provided for this patient. It appeared to Dr. Manire that the patient's left tempo-mandibular joint might be the origin of his painful headaches and ear problem. This joint was injected with medicines and a day or two later the patient was much improved and no longer complaining on May 16, 1968.

"Therefore on May 17, 1968 this patient gave his full and enlightened consent for Dr. Manire to perform surgery on his right foot and left leg to attempt to eradicate drainage. The right foot was extensively explored but no evidence of drainage or reactive bone or soft tissue was found. The inferior rim of the bony cavity of the left leg was removed and a portion of this cavity again scraped. No pockets of pus were found anywhere around this cavity. Postoperatively Mr. Ayers was placed on the powerful antibiotic Keflin, the major narcotic Demerol 100 mg. every four hours as needed for pain and the sleeping medication Phenobarbital by injection. He shall be continued on these as long as this is the judgment of his physicians. When they feel that a reasonable time has passed since surgery and that objectively he has improved, his medications will be decreased. This patient, Mr. Keith Ayers, has a bone affliction that has many times proven discouraging for patient and physician alike. We again hope that the most recent surgery will be a beneficial step in the eradication of this bone infection.

\* \* \* \* \* \*

" \* \* \* The three qualified specialists in general surgery, who are responsible for this man's day to day care, have conferred frequently on his needs, and have given attentive ear to his complaints, and have used their combined best judgments in giving him medications. His best interest remains our first concern and intent."

Petitioner's traverse to the response to the order to show cause states that he "very seldom" took the prescribed Darvon because it "burned [his] stomach" and caused him to develop a rash; that the prescribed Levoprome made him vomit; that he became immune to Talwin before his operation on February 22, 1968, and that the subsequent administration of this drug did not relieve his post-operative pain and he so informed his doctors; that he was given Demerol only once prior to his last surgery on May 17, 1968; that following this last operation he was "treated the same as they treat others" and he has no complaints about this operation; that he was given Morphine after his surgery on December 22, 1967, and when he discovered what it was he requested that its use be discontinued; that he "took (2) shots Codene" (sic) because of a head injury but that Dr. Harcourt discontinued its use when he discovered that it was being given to him; that he is allergic to Codeine "if taken in a big quantity" and that he had received "a very small dose"; that the prescribed chloral Hydrate "is diluted with water to weaken the amount and has no or at least very little effect after the first week you take it"; that although he did receive "pain medication", he feels that it was inadequate; that although the cavity in his leg was not caused by respondents, they enlarged it and made it painful; that he had given prior consent to his surgical treatment because he assumed that the doctors at the Medical Center know as much as "outside doctors"; that the Medical Center doctors have damaged a nerve in his leg which causes him much pain and prevents him from walking even though he has a leg brace; and that he believes that the judgment of his treating doctors at the Medical Center was wrong.

The care, custody, control, discipline, and treatment of federal prisoners is vested in the Attorney General of the United States. Section 4082, Title 18, U.S.C. The United States Court of Appeals for the Eighth Circuit has stated the following in the case of Haynes v. Harris (C.A. 8, 1965), 344 F.2d 463, at 465:

"One of the paramount purposes for which a defendant is committed to the Medical Center is that he have the benefit of receiving from trained and qualified personnel proper examination, diagnosis, and all necessary and available treatment."

It is only in exceptional circumstances that a court will undertake to review the nature and conditions of a prisoner's otherwise lawful confinement. Harris v. Settle (C.A. 8, 1963), 322 F.2d 908. Petitioner's allegations contained in the petition and traverse to the order to show cause do not, without more, state facts which constitute cruel and unusual punishment within the prohibition of the Eighth Amendment. Further, they do not constitute a claim of denial of needed medical treatment.

It appears that the petitioner is alleging that the medical treatment and medication he received is not sanctioned by approved medical practice. If it is alleged that the nature and method of medical treatment received and that the nature of medication or its administration is not sanctioned by any substantial recognized medical authority, a claim for relief may be stated. Cf. United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805. In such event, the claim would be cognizable in habeas corpus if the method and type of treatment and administration is currently continuing. In re Baptista (W.D.Mo., 1962), 206 F.Supp. 288. If the allegations relate to past events not probably recurring, the claim would be cognizable

as a civil action for damages for negligence or malpractice.

Here, the petitioner's complaints relate to the alleged negligence of the doctors at the Medical Center who performed surgery on him on four separate occasions: December 22, 1967; February 9, 1968; May 17, 1968; and June 17, 1968. The surgical treatment of which petitioner complains has already occurred, and it is not alleged that he may be required to undergo another operation. Therefore, as to these complaints, petitioner's remedy is in a civil action for damages.

Petitioner's complaints also relate to the alleged failure of the doctors treating him at the Medical Center to prescribe the proper and appropriate medication to reduce the pain from which he suffered. The record shows that petitioner has received a great deal of medication in the past for relief of pain. Petitioner may still require medication in this regard, and it can be reasonably assumed that he is receiving it if required. This is not a case of a refusal to provide needed medical care and treatment for an inmate as would justify the issuance of a writ of habeas corpus. On the contrary, petitioner has received much medical attention and complains of the type and degree of pain relieving medication needed. Petitioner does not allege that the current treatment is unauthorized by competent medical authorities. Therefore, the petition should be dismissed without prejudice to petitioner's right to claim relief in a civil action for damages or in a subsequent petition for habeas corpus if petitioner's past circumstances recur.

The dilemma presented in this case is similar to that presented in the case of Veals v. Ciccone (W.D.Mo., 1968), 281 F.Supp. 1017. Here a convict is provided with needed medical care and medication in what is not alleged to be a manner unsanctioned by competent medical authority. If medical care deemed appropriate by the doctors is refused, he may claim cruel and unusual punishment. If it is administered, he may claim that he was treated in a negligent manner and a suit for damages against the prison officials and the United States may result. The manner of treatment is in the discretion of the treating physicians and surgeons.

For the foregoing reasons, it is

Ordered that the petition for federal habeas corpus herein be, and it is hereby, dismissed without prejudice to any civil action for damages.