**William Horace QUEEN, Plaintiff,**

v.

**SOUTH CAROLINA DEPARTMENT OF CORRECTIONS et al., Defendants.**

**J. C. McCRARY, Plaintiff,**

v.

**T. A. EDMONDS, Supervisor, Data Processing Center, et al., Defendants.**

**Paul Ulysses DEMPS, Plaintiff,**

v.

**William D. LEEKE, Director, J. W. Strickland, Warden, Central Correctional Institute, et al., Columbia, S. C., Defendants.**

Civ. A. Nos. 69–831 to 69–833.

United States District Court
D. South Carolina,
Columbia Division.

Jan. 5, 1970.

Herbert W. Louthian (court-appointed), Columbia, S. C., for plaintiffs.

Daniel R. McLeod, Atty. Gen., Emmet H. Clair, Asst. Atty. Gen., Columbia, S. C., for defendants.

## OPINION and ORDER

DONALD RUSSELL, District Judge.

All the plaintiffs are inmates of the South Carolina Penitentiary and they have filed their various proceedings separately, complaining of arbitrary and discriminatory treatment. The defendants are the officials of the State Correctional Department, with responsibility for the operation of the State Penitentiary. Because all involve a like complaint of unreasonable and discriminatory prison treatment, the actions were appropriately consolidated. A hearing was had and each plaintiff was afforded full opportunity to present his evidence of alleged discriminatory treatment. At such hearing, the plaintiffs were represented ably and competently by as-

signed counsel, whose diligence and ingenuity in their representation are to be commended. The defendants, represented by the office of the State Attorney General, also, offered evidence in support of the action taken in each of the cases by the prison authorities.

 The controlling principles involved in these proceedings have been marked out fairly clearly in recent decisions. In keeping with the "new emphasis on the rights of the accused",[1] the Courts, while recognizing that the administration of a penal institution is an executive and not a judicial function[2] vesting wide discretion in the prison officials for maintaining discipline and order,[3] have steadily eroded the old "hands-off" doctrine in dealing with complaints of prisoners[4] and have increasingly accepted the principle that the penal inmate is not stripped of all his civil rights when he crosses the threshold of the prison but those that "are fundamental follow him, with appropriate limitations, through the prison gate."[5] Nor do the prison walls "foreclose his access to the courts to protect those rights."[6] As our own Court of

1. 9 William & Mary L.Rev. 178, at p. 181.

2. Douglas v. Sigler (8th Cir., 1967) 386 F.2d 684, 688; Ayers v. Ciccone (D.C. Mo.1968) 300 F.Supp. 568, 572, aff. 413 F.2d 1049.

3. McCloskey v. State of Maryland (4th Cir., 1964) 337 F.2d 72, 74; Cooper v. Pate (7th Cir., 1967) 382 F.2d 518, 521; Schack v. State of Florida (5th Cir., 1968) 391 F.2d 593, 594, cert. den. 392 U.S. 916, 88 S.Ct. 2080, 20 L.Ed.2d 1376.

4. See, Edwards v. Duncan (4th Cir., 1966) 355 F.2d 993, 994: "The District Court's opinion is based on the hands-off doctrine, which is a questionable absolutism in many areas today. * * *"

5. Courtney v. Bishop (8th Cir., 1969) 409 F.2d 1185, 1187.
 The trail-blazer in this view was Coffin v. Reichard (6th Cir. 1944) 143 F.2d 443, 445, 155 A.L.R. 143, cert. den. 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001, in which it was held that a prisoner "retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." The principle is stated with somewhat different or reverse emphasis in Sostre v. McGinnes (2nd Cir., 1964) 334 F.2d 906, 908, cert. den. 379 U.S. 892, 85 S. Ct. 168, 13 L.Ed.2d 96: "A prisoner has only such rights as can be exercised without impairing the requirements of prison discipline." Edwards v. Duncan, supra, (355 F.2d at p. 994) is more in line with the statement in Sostre. In Edwards, our Court of Appeals put it:
 "We need not now decide whether a prisoner is entitled to every right not specifically taken away from him by law, and to judicial inquiry into alleged deprivations of such rights. The hands-off doctrine operates reasonably to the extent that it prevents judicial review of deprivations which are necessary or reasonable concomitants of imprisonment."
 See, also, Sewell v. Pegelow (4th Cir., 1961) 291 F.2d 196, 198:
 " * * * but it has never been held that upon entering a prison one is entirely bereft of all of his civil rights and forfeits every protection of the law."

6. Edwards v. Duncan, supra; Sewell v. Pegelow, supra; Hudson v. Hardy (D.C. Cir., 1968) 412 F.2d 1091, 1093. Such right has been exercised in a variety of ways. See, Beyond the Ken of the Courts: A Critique of Judicial Refusal to Service the Complaints of Convicts, 72 Yale L.J. 506 (1963). Habeas Corpus has been recognized as an appropriate remedy. Coffin v. Reichard, supra; cf., however, Roberts v. Pegelow (4th Cir., 1963) 313 F.2d 548, 549–550; Granville v. Hunt (5th Cir., 1969) 411 F.2d 9, 12; and United States ex rel. Knight v. Ragen (7th Cir., 1964) 337 F. 2d 425, 426, cert. den. 380 U.S. 985, 85 S.Ct. 1355, 14 L.Ed.2d 277.
 In the Granville Case, the Court said:
 "We also note that this Court has long taken the position that habeas corpus is not available to prisoners who are complaining only of mistreatment during their legal incarceration. Our rationale has been that 'it is not the function of the Courts to superintend the treatment and discipline of prisoners in penitentiaries, but only to deliver from imprisonment those who are illegally confined.'"
 For courts following the conclusions in Roberts v. Pegelow, it has been customary to treat petitions by prisoners "as prayers for injunctive relief", without attempting to resolve all "procedural difficulties". See, Barnett v. Rodgers (1969) 133 U.S.App.D.C. 296, 410 F.2d

Appeals has phrased it, "If a tractable inmate is subjected to cruel and unusual punishment or if his exercise of a constitutional right is denied without semblance of justification arising out of the necessity to preserve order and discipline within the prison, he may have a right of judicial review." [7] Thus, where there is a restriction upon a prisoner's constitutional right of religious freedom [8] or right of access to the courts [9] or where he is subjected to punitive treatment so out of proportion to his infraction of prison rules as to constitute a violation of the guarantees of the Eighth Amendment [10] or where the prisoner's "discipline or discrimination" is "of such character or consequence as to shock general conscience or to be intolerable in fundamental fairness, and so to amount to illegal administration of prison sentence", [11] the prisoner has been held entitled to judicial protection of his rights. [12] But, on

995, 998, note 4. Mandamus has been sustained as a proper procedure in Long v. Parker (3rd Cir., 1968) 390 F.2d 816, 818–819; Walker v. Blackwell (5th Cir., 1969) 411 F.2d 23, 24; Martin v. Gathright (D.C.Va.1967) 279 F.Supp. 485, 486; Brown v. McGinnis (1962) 10 N.Y. 2d 531, 225 N.Y.S.2d 497, 180 N.E.2d 791, 794. The Civil Rights Act has been often invoked. Rivers v. Royster (4th Cir., 1966) 360 F.2d 592, 594; Coleman v. Johnston (7th Cir., 1957) 247 F.2d 273; Burns v. Swenson (D.C.Mo.1969) 300 F.Supp. 759, 762. " 'petition for writ of declaratory judgment' " was sustained as a proper remedy in Hudson v. Hardy, *supra*, (412 F.2d at p. 1092). Federal prisoners have also resorted to the Federal Tort Claims Act. Winston v. United States (2nd Cir., 1962) 305 F.2d 253, 270, aff. 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805; Hill v. Gentry (8th Cir., 1960) 280 F.2d 88, cert. den. 364 U.S. 875, 81 S.Ct. 119, 5 L.Ed.2d 96. See, Beyond the Ken of the Courts: A Critique of Judicial Refusal to Review the Complaints of Convicts, *supra*, where the various remedies available to prisoners are discussed in detail.

7. McCloskey v. State of Maryland (4th Cir., 1964) 337 F.2d 72, 74.

8. Cooper v. Pate (1964) 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030; Howard v. Smyth (4th Cir., 1966) 365 F.2d 428, 430–431, cert. den. 385 U.S. 988, 87 S.Ct. 599, 17 L.Ed.2d 449; Cooper v. Pate (7th Cir., 1967) 382 F.2d 518; Barnett v. Rodgers, *supra;* 45 N.C.L.Rev. 535 (1967). In the *Cooper* Case, (382 F.2d p. 521) the Court said:

"Courts will closely scrutinize the reasonableness of any restriction imposed on a prisoner's activity in the exercise of his religion, and specially so where the adherents of one faith are more heavily restricted than the adherents of another."

In Long v. Parker, *supra*, the Court stated (390 F.2d p. 822) that, in order to justify a restriction of the religious freedom of a prisoner, the prison officials must establish that the restriction is necessary to prevent a clear and present danger to prison security or discipline or the orderly functioning of the prison institution.

9. Ex parte Hull (1941) 312 U.S. 546, 549, 61 S.Ct. 640, 85 L.Ed. 1034, rehearing den. 312 U.S. 716, 61 S.Ct. 823, 85 L.Ed. 1146; Landman v. Peyton (4th Cir., 1966) 370 F.2d 135, 137, note 1, cert. den. 388 U.S. 920, 87 S.Ct. 2142, 18 L.Ed.2d 1367; Brown v. State of South Carolina (D.C.S.C., 1968) 286 F. Supp. 998, 1001; Blanks v. Cunningham (4th Cir., 1969) 409 F.2d 220, 221; Burns v. Swenson, *supra*.

10. Fulwood v. Clemmer (D.C.D.C.1962) 206 F.Supp. 370, 379.

11. Carey v. Settle (8th Cir., 1965) 351 F.2d 483, 485; Lee v. Tahash (8th Cir., 1965) 352 F.2d 970, 972. See, Roberts v. Pegelow, *supra* (313 F.2d at p. 550) : "So long as the punishment imposed for an infraction of the rules is not so unreasonable as to be characterized as vindictive, cruel or inhuman, there is no right of judicial review of it."
A recent case puts it that punishment "is unconstitutional if it offends concepts of decency and human dignity and precepts of civilization which Americans profess to possess, or if it is disproportionate to the offense, or if it violates fundamental standards of good conscience and fairness." Holt v. Sarver (D.C.Ark.1969) 300 F.Supp. 825, 827.

12. Indeed, one commentator has gone so far to conclude that, "At present, therefore, it appears that a majority of courts are prepared to undertake judicial review of virtually every phase of prison administration". 9 William & Mary L.Rev. 178, at p. 189 (1967).

the other hand, it seems settled that "routine security measures and disciplinary action rests solely in the discretion of the prison officials" [13] and "the necessity for effective disciplinary control is so impelling that judicial review of them is highly impractical and wholly unwarranted".[14] Absent unusual circumstances involving, as I have said, some infringement of constitutional rights or punishment intolerable in fundamental fairness and "so unreasonable as to be characterized as vindictive, cruel or inhuman", courts are not available for review of prison administration and, as one Court has wisely suggested, they must be careful to guard against being used or invoked by prisoners as "mere outlets for general discontent in having to undergo penal restraint or of personal satisfaction in attempting to harass prison officials." [15] Or, as a recent commentator has summarized it:

"It is doubtful that the goals of modern penology will be saved in a prison where the administration is handcuffed by judicial controls, and the prisoners (armed with habeas corpus, mandamus, the Civil Rights Act, the Federal Torts Claims Act, with the First and Eighth Amendments) run the institution. In a country where the sky rocketing crime rate has become a national issue and law enforcement is having its own problems with judicially imposed restrictions, a breakdown of the prison system hardly seems desirable."

Friend, Judicial Intervention in Prison Regulation, 9 William & Mary L.Rev., 178 at p. 192 (1967).

■ Measured by the foregoing judicial standards, it would seem that the several complaints of the plaintiffs concern matters that fall properly within the discretionary powers of the prison officials and are not therefore justiciable. These complaints involve no denial of freedom of religion; there has been no interference with the right of access to the courts; the channels for complaints within the institutional structure, whether against individual officials or against prison regulations, have been kept open. The plaintiffs offer no reliable evidence of any inhumane attitude on the part of the penal authorities; they proffer no proof of any personal bias or prejudice, of any "vindictive" action, against them on the part of the prison officials. On the contrary, the evidence shows that the complaints concern routine determinations made in good faith by prison officials. There are no unusual circumstances surrounding such determinations. They are the determinations with which courts will not normally interfere. The plaintiffs have wholly failed to meet their burden of proof. The defendants, however, are not content

13. Roberts v. Pegelow, *supra* (313 F.2d 548, 551).

14. McCloskey v. State of Maryland, *supra*, at p. 74 (337 F.2d); Roberts v. Pegelow, *supra* (313 F.2d at p. 551); Cooper v. Pate, *supra* (382 F.2d at p. 521); Kostal v. Tinsley (10th Cir., 1964) 337 F.2d 845, 846, cert. den. 380 U.S. 985, 85 S.Ct. 1354, 14 L.Ed.2d 277; United States ex rel. Knight v. Ragen, *supra* (337 F.2d at p. 426); Fallis v. United States (D.C. Pa.1967) 263 F.Supp. 780, 782.

Thus, in United States v. Radio Station WENR (7th Cir., 1953) 209 F.2d 105, a claim of discrimination in the selection of radio announcers from among prison inmates for a prison-originated radio program was found not justiciable. Similarly, in Walker v. Pate (7th Cir., 1966) 356 F.2d 502, cert. den. 384 U.S. 966, 86 S.Ct. 1598, 16 L.Ed.2d 678, a claim of discrimination in the allowance of visiting rights was similarly dismissed. And in Startti v. Beto (5th Cir., 1969) 405 F.2d 858, 859, the Court in denying a petition, said: "The petitioner's complaint does not rise to the constitutional level but deals with matters of prison discipline solely the concern of the state."

The reason for this judicial hesitancy to intrude upon penal administration is evident in the circumstances of prison life detailed in a recent issue of Newsweek, January 5, 1970, pp. 19–20.

15. Carey v. Settle, *supra*, at pp. 484–485 (351 F.2d).

to rest their defense on the non-justiciability of the complaints. They have preferred to go beyond the legal requirements of their defense and have justified the reasonableness of their actions by proof that is both clear and convincing.

To review the facts connected with each of the claims asserted by the plaintiffs as established by the record herein:

### 1. J. C. McCrary

This plaintiff, serving a life sentence for murder imposed in the Court of General Sessions for the County of Greenville, South Carolina, claimed he was unfairly and discriminatorily denied admission to a data processing training program organized in 1967 by the penal institution. This program was largely federally financed. It was an experimental program, authorized for a single class and intended to cover about six months' instruction. In its application for financial support from the federal government for such program, the penal authority had outlined the program as one intended to provide released prisoners with a skill that would make their conversion to normal life easier. In keeping with such purpose, the program was designed to admit only those prisoners subject to reasonably early release. As thus submitted, the program was approved by federal authorities and a financial grant in support authorized. The program as approved by federal authorities required a minimum of twenty federal students under the program. However, the classroom facilities available at the penal institution were sufficient to accommodate twenty-four students. The penal authorities determined to utilize these four additional places, not required under the federal program, for training four inmates not subject to early release, it being their intention to use such trainees in their own data processing center. The plaintiff, who did not seek admission until some time after the class

was formed, claimed originally the right of admission as a federal trainee. Admittedly, the plaintiff was not entitled to admission as a federal trainee: His release date, if ever, was many years away. He could only have sought admission as one of the four state trainees. The refusal of the plaintiff's application for admission to the program, according to the prison authorities, was based on the fact that, at the time plaintiff sought admission he was not qualified as a federal trainee and all the slots for state trainees had been filled by persons who were already engaged in the prison's data processing and who had expressed a desire to work in that unit. The authorities emphasized, also, that the plaintiff, when interviewed, indicated he had no interest, after training, in working in the prison's data processing center. The prison authorities pointed out that they had no interest in training an inmate, under a long sentence, with a skill he did not wish to utilize in prison. The prison authorities indicated, however, that, if a new program was approved by the federal authorities, they would be pleased to consider plaintiff's application for admission in that program, if he could qualify at that time under the standards established for such program. The prison authorities were scrupulous in explaining to the plaintiff both the reasons for the denial of his admission to the program and in indicating, if a new program was authorized, a willingness to counsel with him about it. Their conduct was fair and proper in every respect.

The plaintiff offered no proof that would give any reason to conclude that the prison authorities were prejudiced in any way against him. He did contend that one of the state trainees did not meet the standards asserted by the prison authorities. There was some conflict in the testimony on this point but I am convinced that the prison authorities acted in good faith and that their version of the impartial selection of the state trainees was accurate.

■ In sum, I find no reliable evidence that the plaintiff was unfairly discriminated against in the denial of his request for admission to the training class. Moreover, this complaint may now be considered moot. His only relief would be assurance of admission in a new class. But, as already pointed out, this program is not a continuing one. It was approved merely as an experimental project. Whether the federal government will approve a new project with like purpose is purely conjectural. See, Moore v. Ogilvie (1969) 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1; cf. Hall v. Beals (1969) 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214, filed November 24, 1969.

## II. William Horace Queen

■ The petitioner complains of the denial of outside visiting privileges and a right to visit with his family in what is commonly known as Langford Hall. The defendants justify the denial on several grounds. The available facilities for such visiting, they point out, is limited and it is necessary, therefore, to restrict the number of prisoners accorded this right. Since all "trusties" are automatically accorded this privilege, the remaining availabilities are quite small. These are made available to those with good records, with preferences based on length of service and with proper consideration of the nature of the prisoner's offense. There is no reason to conclude that the plaintiff's request was not handled in the normal way. The plaintiff does contend that one of the penal board, which passed on his request, had shouted at him that, so long as he (the official) was at the institution, the plaintiff's request would never be approved. The prison official, charged with this statement, categorically denied making it, emphasizing that he did not know the plaintiff, had had no contact with him and could have had no reason for any bias against him. I am convinced that this testimony of the prison official in question is correct. Not even the plaintiff offers any reason for bias on the part of this official. Actually, the plaintiff seems to be well regarded by prison officials. At least, two of them testified that he was a model prisoner; and it seems likely that his request will be granted as soon as further availabilities develop. I find no credible evidence of discrimination in this case.

## III. Paul Ulysses Demps

■ This is a somewhat more complicated case. The plaintiff is charged with the murder of another inmate, who had long acted as the prison lawyer for his fellow inmates.[16] The prison authorities feared for his safety if he was brought into intimate contact with the other inmates, many of whom were believed to have been deeply devoted to the murdered inmate. He was accordingly placed in Cell Block No. 2 for administrative segregation, but not in solitary confinement. Unlike the situation in Landman v. Peyton (4th Cir., 1966) 370 F.2d 135, cert. den. 388 U.S. 920, 87 S.Ct. 2142, 18 L.Ed.2d 1367, he was not mistreated in any way and he made no complaint about his food. The good faith of the prison authorities in taking their action in placing plaintiff in administrative segregation is not questioned. What the plaintiff really complains of is the fact that his incarceration is in a building where, opposite the cells reserved for prisoners such as himself, are kept the incorrigibles from the State Institution for the Mentally Ill. He contended that these mentally-ill inmates often shouted during the night and interfered with his ability to sleep. For this reason, he expressed a preference for the "maximum security" block, even though this might subject him to possible attack from fellow prisoners. On the other hand, except for the distraction offered by the mentally deranged inmates, the plaintiff's present

16. Brown v. State of South Carolina, *supra* (286 F.Supp. 998, 1001).

quarters offer him superior accommodations to those that would be available to him in the "maximum security" block. Moreover, the prison authorities are completing a new facility for housing the mentally deranged and it is only a matter of a few weeks before their presence in the building where the plaintiff is housed will end. It should be noted, too, that the plaintiff is awaiting trial. He contends that his evidence will show that he killed the deceased in an attempt to protect another prison inmate of immature years from a despicable assault by the deceased. It is suggested that the facts surrounding the death of the inmate will exonerate the plaintiff and put the deceased inmate in an unfavorable light in the eyes of his former fellow prisoners, thereby eliminating any basis for apprehension for his safety as a member of the prison population. The trial of the plaintiff should not be far away. Whether after that trial and after all the facts surrounding the death of his fellow inmate are known by the prison population, it would be considered necessary for plaintiff's own safety to continue the plaintiff in this protective segregation is a question that can only be resolved after the trial. For the time being, it would seem that the action of the prison officials represents a reasonable precaution taken by them in good faith, solely for the purpose of protecting the plaintiff and no wise as punishment. Certainly, such action, *taken prior to trial and reviewable subsequently in the light of the facts that might develop at trial,* represents no infringement of the plaintiff's constitutional rights.[17]

■ It should be noted, however, that at the hearing the defendants indicated that, while the original determination to place plaintiff Demps in segregation was based on consideration of the plaintiff's own safety, additional information on the plaintiff's prior prison record in Florida between the years 1964 and 1967, received on October 27, 1969, suggested that the plaintiff was "a very violent inmate" whose "violent tendencies" and "emotional instability" had resulted in his being placed in "Maximum Security", while incarcerated in that prison. The defendants testified that this information, taken in connection with the plaintiff's conduct at his present place of incarceration, would have to be evaluated carefully before the plaintiff could be allowed to mingle freely with the prison population at the institution. Such evaluation would represent an area of prison administration with which the courts would not interfere, especially where, as here, the authorities are acting with obvious fairness and without any feelings of vindictiveness or prejudice but solely with a view to discharging in good faith their own responsibility for the security of their institution and its inmates. See, Sharp v. Sigler (8th Cir., 1969) 408 F.2d 966, 972.

I accordingly find that none of the claims of the plaintiffs warrant relief at this time at the hands of the Court and that their petitions should be dismissed.

And it is so ordered.

---

17. It would seem possible that, if the prison authorities failed to take proper precaution to protect the plaintiff, they might well be liable under the Civil Rights Act for any injuries sustained by the plaintiff as a result of an attack by a fellow prisoner. Cf., Johnson v. United States Government (D.C.Va., 1966) 258 F.Supp. 372, 376.