Harold A. LATHROP, Plaintiff,

v.

Lou V. BREWER, Individually and in his capacity as Warden of the Iowa State Penitentiary at Fort Madison, Iowa, et al., Defendants.

Civ. No. 11–377–C–2.

United States District Court,
S. D. Iowa, C. D.

April 3, 1972.

874

Robert Bartels, Iowa City, Iowa, for plaintiff.

Richard C. Turner, Atty. Gen. of Iowa, Larry S. Seuferer, and Richard N. Winders, Asst. Attys. Gen., Des Moines, Iowa, for defendants.

## MEMORANDUM AND ORDER

HANSON, Chief Judge.

This is an action for injunctive and other relief, brought pursuant to 42 U. S.C., Section 1983 and 28 U.S.C., Section 1343(3) to redress certain alleged deprivations of procedural due process in the administration of discipline at the

Iowa State Penitentiary, Fort Madison, Iowa ("Fort Madison"). Plaintiff herein is an inmate of that institution. Defendants are each in some way responsible for administration at Fort Madison, including the administration of discipline.

Trial in this cause was had on January 21, 1972, and the action has thereupon been submitted for decision on the merits.

## FACTS

Plaintiff has had at least three significant encounters with the disciplinary system at the Iowa State Penitentiary, but only two of these encounters are relevant here. The first took place on February 9, 1971, when plaintiff was accused by defendant Haas, a correctional officer, of "loitering on the range".[1] The first plaintiff heard of the charge against him, however, was on February 11, 1971, when Captain Parrot came to his cell, indicated he had a report of plaintiff's misconduct from Officer Haas, read it, cited the rule allegedly violated and asked if it was true. Lathrop did not know what "loitering on the range" was, but after Capt. Parrot explained, he admitted the violation. Parrot then departed, without indicating that Lathrop could call witnesses to rebut the charge.

Approximately two hours later, Lathrop was brought before an Adjustment (Disciplinary) Committee consisting of Capt. Parrot (the investigating officer), and defendants Menke and Sanders.[2] He was not told of any right to counsel or right to call witnesses to testify, nor was he given the opportunity to confront his accuser, Officer Haas, who was not present. Lathrop was again informed of the charge, and, without admitting any violation of the rules, admitted the offending

1. Although it has been herein alleged that this charge was in retaliation for protests plaintiff had made about an earlier disciplinary action taken in June, 1970, no proof has been forthcoming to show this alleged malice, or that it is a common practice for fictional disciplinary reports to be filed by correctional officers in or-

der to induce particular patterns of conduct on the part of inmates. Accordingly, plaintiff's request for an injunction of such practices must be dismissed.

2. The practice of having the investigating officer sit on the Adjustment Committee has now been discontinued.

act. Acting on the basis of Lathrop's admission and the reports of Capt. Parrot and Officer Haas, the Committee sentenced plaintiff to three days in solitary confinement and 30 days "on grade" (loss of privileges), as well as the forfeiture of two days of good time and ten days of honor time.

Plaintiff's second material encounter with the disciplinary process at Fort Madison began on November 5, 1971, when he was accused by Robin Nicol, an off-duty correctional officer, of leaving his place of assignment, while at the University Hospital in Iowa City, despite the asserted fact that he did not do so. To conform to Officer Nicol's report, Officer Harris, who had custody of Lathrop, likewise reported him for being absent for 35 minutes, although there is testimony that Officer Harris never independently noted Lathrop's absence.

Upon return to Fort Madison, plaintiff was brought to the office of Capt. Maynard and informed that he was on report for leaving his place of assignment. It is undisputed that Lathrop became incensed and verbally, although not physically, abusive. He was thereupon placed in administrative segregation, and additional reports of misconduct were lodged as a result of this behavior.

On November 8, 1971, Lt. Eschman was assigned to be investigating officer of the misconduct reports against Lathrop, as part of a group of 7 or 8 other reports to be investigated that day. He went to Lathrop's cell, read the misconduct reports to Lathrop, and the charges lodged against him. Plaintiff denied these charges and indicated that he had witnesses who could testify that he had never left the hospital, although Eschman and Lathrop differ as to who these witnesses were said to be, three inmates, (Lathrop's version) or nine nurses (Eschman's version). At any rate, Eschman never made any attempt to confirm or refute Lathrop's denial by independ-

ent investigation of any witness, despite the ready availability of such witnesses within the prison; his sole further "investigation" was to go to each of the charging officers and ask if their report was true, and then submit a written report to the Adjustment Committee.

About an hour after Eschman visited Lathrop, Lathrop was brought before an Adjustment Committee consisting of James Helling and Capts. Gregory and Susich. He was informed of the offense and given a chance to explain.

Lathrop readily admitted the threat charges, but denied leaving the hospital, indicating that witnesses, including Russell Mills, another inmate, could testify to this. He was not given counsel, nor allowed to present witnesses in his own behalf. None of the accusing officers were present, so plaintiff was not given the opportunity to confront them. Lathrop was then excused while the Adjustment Committee deliberated. Relying on the misconduct reports filed by the accusing officers, the report of the investigating officer, and Lathrop's protestations, Lathrop was given 5 days in solitary confinement, 30 days "on grade" (no privileges) and a forfeiture of 5 days good time and 10 days honor time.

Lathrop's encounters with the disciplinary system at the Iowa State Penitentiary appear to be typical of disciplinary practice there and indeed at most other penal institutions in the State of Iowa.[3] Upon the commission of an infraction a formal report is filed by the accusing officer. This goes to the Chief of Correctional Services, who determines that it is actionable and then assigns it to an investigating officer. This individual confronts the inmate charged with the report, indicates the rule violated,[4] and asks the inmate if the report is true. If an inmate admits an act constituting an offense, the investigation is over. If he denies the veracity of the report, the investigating officer only takes the re-

---

3. The Court has now pending before it in other causes similar procedural allegations as regards these other institutions.

4. In practice the inmate is *usually* made aware by the accusing officer that a report has, or will be filed, and why, although this is not required.

port to the accusing officer and asks if it is true; he makes no, or very little, attempt at independent investigation. In either event, the investigating officer's report is brought to an adjustment or disciplinary committee consisting of supervisory prison personnel. This committee calls the inmate before it, but neither affords him counsel or counsel-substitute, the opportunity to confront or cross-examine the accusing officers (who are not summoned), nor the right to present witnesses in his own behalf. Furthermore, a prisoner is only given about an hour between the time he is formally notified of the pendency of charges and his hearing, although he often knows a misconduct report is being filed. Then, upon consideration solely of the reports of the accusing and investigating officers, and the statement of the inmate himself, punishment is imposed, or the inmate is acquitted. Punishment may range from a warning to loss of good and honor time, solitary confinement or loss of privileges, and is reviewed by the Warden and by the Iowa State Bureau of Corrections.

## SCOPE OF JUDICIAL REVIEW

■ The Court at the outset recognizes that it should not be an unduly hospitable forum, for it is well recognized that it is not the function of the Court to run the prisons, to supervise day to day treatment and discipline. Much must be left to the good faith discretion of prison officials, Sawyer v. Sigler, 445 F.2d 818 (8th Cir. 1971), which discretion includes the disciplining of prisoners, Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970), cert. den. 404 U.S. 1062, 92 S.Ct. 743, 30 L.Ed.2d 751 (1972). However, contrary to earlier thinking on this subject, such as Stiltner v. Rhay, 258 F.Supp. 487 (W.D.Wash.1965), aff'd 367 F.2d 148, cert. den. 385 U.S. 941, 87

S.Ct. 310, 17 L.Ed.2d 220, and Kostal v. Tinsley, 337 F.2d 845 (10th Cir. 1964), which held such discretion to be beyond review, it is now well recognized that prison officials' discretion is not unfettered, but must be scrutinized for interference with paramount constitutional rights. Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Cf., also, Morrissey v. Brewer, 443 F.2d 942 (8th Cir. 1971) cert. granted 404 U.S. 999, 92 S.Ct. 568, 30 L.Ed.2d 552 (1971); Anderson v. Nosser, 438 F.2d 183 (5th Cir. 1971). These rights are not lost upon the closing of the prison gates, but are only constricted by the necessary accoutrements of incarceration, Courtney v. Bishop, 409 F.2d 1185 (8th Cir. 1969), cert. den. 396 U.S. 915, 90 S.Ct. 235, 24 L.Ed.2d 192. However, this is the outer limit of judicial scrutiny as well as the minim. Only where constitutional rights are infringed is the Court empowered to act, McMichaels v. Hancock, 428 F.2d 1222 (1st Cir. 1970), Stump v. Bennett, 398 F.2d 111 (8th Cir. 1968), cert. den. 393 U.S. 1001, 89 S.Ct. 483, 21 L.Ed. 2d 466, and not where there is only a maladministration of state law or question of administrative judgment that does not rise to constitutional dimension, Holt v. Sarver, 442 F.2d 304 (8th Cir. 1971); Jackson v. California, 336 F.2d 521 (9th Cir. 1964); In re Converse, 137 U.S. 624, 11 S.Ct. 191, 34 L.Ed. 796 (1891).

## CONSTITUTIONAL RIGHTS

The question at bar is thus whether the punishment practices at the Iowa State Penitentiary are violative of Lathrop's constitutional rights, or of the rights of inmates generally, and, more particularly, whether precepts of due process have been violated in the following particulars alleged:[5]

5. Whether the procedures complained of constitute cruel and unusual punishment is not in issue here. Neither is the question whether the punishments imposed themselves violate the Constitution, although it should be noted that it has long

been held that they do not, see Wilwording v. Swenson, 439 F.2d 1331 (8th Cir. 1971) rev'd on other grounds 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418; Burns v. Swenson, 430 F.2d 771 (8th Cir. 1971); Sostre v. McGinnis, 442 F.

1. Failure to give adequate notice of violations of prison rules.
2. Failure to provide prisoners with the rule allegedly breached.
3. Failure to provide an independent tribunal for the administration of discipline.
4. Failure to allow prisoners to confront their accusers, and to cross-examine them.
5. Failure to allow a prisoner the right to call witnesses in his own behalf.
6. Failure to provide counsel, or a counsel surrogate.
7. Failure to undertake any meaningful investigation where there is a substantial factual dispute.

In determining whether these deficiencies constitute a deprivation of due process, the Court cannot be unmindful of the most recent pronouncement of this Circuit on the subject of what process is "due" upon a *non-emergency* prison disciplinary proceeding. Douglas v. Sigler, 386 F.2d 684 (1967),[6] which takes the view that good time is a creature of state law, that there is no constitutional right to good time, and so due process requirements are wholly inapplicable thereto:

The diminution of sentence statutes rests [sic] on legislative grace and not constitutional right. . . .

The allowance of good time to a prisoner and its denial or forfeiture are strictly matters of statute. . . . As a general rule the right to a good-time allowance is contingent until the time arises that its allowance will end imprisonment; the grant or denial of such an allowance is discretionary with the executive officer charged with the administration of its provisions; and its allowance is a matter of grace rather than a right. . . .

Due process requirements are not applicable to forfeiture or revocation proceedings except that administrative due process requires that the person charged be treated fairly and not arbitrarily. No question of administrative due process is presented.

Although the rights/privileges distinction drawn in Douglas has now apparently been rejected in due process determinations both by the U. S. Supreme Court in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) and by this Circuit in Morrissey v. Brewer, 443 F.2d 942 (1971), it is nonetheless clear that *Douglas* does *not* say that there is *no* process due; it only holds that prison disciplinary procedures are to be governed by standards of administrative, and not judicial due process. In other words:

While all the procedural safeguards provided citizens charged with a crime obviously cannot and need not be provided to prison inmates charged with violation of a prison disciplinary rule, some assurances of elemental fairness are essential when substantial individual interests are at stake. Nolan v. Scalati, 430 F.2d 548 (1st Cir. 1970).[7]

Not incompatible with the *Douglas* requirement that prison disciplinary procedures be fair, and not arbitrary, is the standard of procedural due process set out in Goldberg v. Kelly, *supra*, (citing Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)), Morrissey v. Brewer, *supra*, Bethea v. Dagett, 444 F.2d 112 (5th Cir. 1971) and

---

2d 178 (2d Cir. 1971) cert. den. Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972) ; Cf., also, Courtney v. Bishop, 409 F.2d 1185 (8th Cir. 1969) cert. den. 396 U.S. 915, 90 S.Ct. 235, 24 L.Ed.2d 192.

6. Burns v. Swenson, 430 F.2d 771 (1970) deals with an emergency situation where discipline is required to protect the inmate, another prisoner, or prison em-

ployees, and so is not in point here. Cf., also, Krist v. Smith, 439 F.2d 146 (5th Cir. 1971) ; Lollis v. New York State Dept. of Social Services, 322 F.Supp. 473 (S.D.N.Y.1970).

7. Plaintiff herein concedes that he is not entitled to the full panoply of rights provided defendants in criminal proceedings, Post-Trial Memorandum, February 22, 1972, at 10.

Smith v. Robbins 328 F.Supp. 162 (D. Me.1971). That standard requires the Court to balance the nature of the government function and State interest in the disciplinary procedures as they now exist against the constitutional right alleged, plaintiff's disabilities pertinent thereto, and plaintiff's interest in a fuller hearing with more procedural protections. Only where a prisoner's interest in avoiding a grievous loss such as "grade", solitary, or loss of good or honor time outweighs the governmental interest in summary adjudication may the Court grant prescriptive relief, Goldberg v. Kelly, *supra*, Cluchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971). Cf., also, Howard v. Smyth, 365 F.2d 428 (4th Cir. 1966).

Such a balance was undertaken by this Circuit in Morrissey v. Brewer, *supra*, a case that dealt with procedural due process upon parole revocation rather than in prison disciplinary proceedings. Recognizing "the interest of the State in effectively managing internal and custodial affairs," the heavy administrative burdens placed on correctional authorities already, the broad discretion of prison authorities in controlling persons committed to their custody,[8] the desirability of leaving questions of disciplinary process to the legislature, the necessity of avoiding further burden on the courts with problems of this type, and, finally, the notions of federal-state comity suggested by Younger v. Harris, 401 U.S. 37, 91 S. Ct. 746, 27 L.Ed.2d 669 (1971):

> a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the

States and their institutions are left free to perform their separate functions in their separate ways,

it was concluded upon balance that due process did not require a hearing prior to parole revocation.

Although parole revocation is a very different proposition than that under consideration here, with an entirely different set of factors to be balanced, it is nonetheless true that *Morrissey* is indicative of some factors that must be taken into consideration by this Court in making up a balance for the disciplinary procedures here.

Balancing tests more specifically in point were attempted in Cluchette v. Procunier, *supra*, Sostre v. McGinnis, *supra*, note 5, cert. den. Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (March 6, 1972) and Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y.1970), which all considered for California and New York respectively the identical question posed to the Court here, what rights are so basic that they must be required before the imposition of disciplinary measures as a matter of due process.[9]

*Procunier*, upon such analysis, but with very little explication, held first as to notice that providing a prisoner with only the name and number of the rule allegedly violated is insufficient; rather, 7 days' notice, together with a statement of facts, was required, although the right of summary segregation, where appropriate, was recognized. It further held that written reports to a disciplinary committee were not sufficient, and that the opportunity to confront and cross-examine adverse witnesses was required. Counsel-surrogate

8. Haines v. Kerner, *supra* does not appear to the Court to place any limit on the due regard courts must have for the discretion of prison officials, but only requires that the courts not abstain from regarding prison practices because of that regard.

9. Procunier further deals, under the fifth and sixth amendments, with the situation where an inmate is charged with a

rule violation which is also punishable by further criminal prosecution. Although plaintiff herein was charged with a rule offense, leaving his place of assignment, which may also constitute the crime of escape, it is not necessary to resolve this question here, since it was not raised to the Court and since the possibility of criminal prosecution is extremely remote.

or, in cases where further criminal charges are possible, legal counsel, was required to be provided, as was a written statement of the reasons for the punishment imposed, and an equal right to whatever appeal was provided, although not the right to appeal itself. Finally, *Procunier* required an unbiased finder of fact, one who was not involved in the occurrence, review or investigation thereof, and who was without personal knowledge of the particular incident.

On the other hand, in *Sostre*, heard en banc, Judge Kaufman observed that:

> [Warden] Follette's relationship to Sostre should not be viewed as adversarial in the same sense that a criminal trial is adversarial. Certainly, formal rules of evidence would be entirely inappropriate at a disciplinary proceeding. To dispose sensitively and carefully of each prisoner's unique case with due regard for the effect of each decision on the total fabric of the prison community, prison authorities must have wide access to relevant information. Since, in addition, there is no likelihood that substantial rights would be sacrificed if a prisoner failed, for example, to raise a proper objection or to take a timely appeal, the need for legal skills is less acute. . . . Moreover, the evidence as to whether the prisoner has violated a prison regulation is likely to be simpler, more precise, and more readily at hand. . . . There is correspondingly less need for cross-examination and calling of witnesses. . . . Neither the Model Penal Code nor the Manual of the American Correctional Association would require confrontation and cross-examination, calling of witnesses by the prisoner, counsel or counsel substitute, or a written statement of evidence and rationale, [although], Rhode Island has voluntarily adopted new disciplinary procedures for its prisons, under court supervision, Morris v. Travisono, 310 F.Supp. 857 (D.R.I.1970), which include provisions for a hearing, advance written notice, and assistance by a prison officer, but no

other of the formal safeguards. . . [Id. 442 F.2d at 196, 197–98.] [footnotes omitted].

Judge Kaufman then expressed great reluctance, over a vigorous objection by Senior Judge Waterman, to vest a wide variety of procedural rights in prison disciplinary proceedings without any latent expertise or fresh input as to their impact on prison rehabilitation and good order:

> [W]e think it inadvisable for a federal court to pass judgment one way or another . . . whether formal due process requirements would be likely to help or to hinder in the state's endeavor to preserve order and discipline in its prisons and to return a rehabilitated individual to society. It would be too simplistic to disassociate the impact of punishment meted out after a disciplinary hearing from the method by which the hearing itself is conducted. . . . We would not presume to fashion a constitutional harness of nothing more than our guesses. It would be mere speculation for us to decree that the effect of equipping prisoners with more elaborate constitutional weapons against the administration of discipline by prison authorities would be more soothing to the prison atmosphere and rehabilitation of the prisoner or, on the other hand, more disquieting and destructive of remedial ends.

On consideration, Judge Kaufman then found that some rights were sufficiently compelling to outweigh possible adverse impacts on the prison atmosphere and prisoner rehabilitation:

> [T]he district court held that several elements of trial-type procedure . . . were required by due process in every instance of prison discipline resulting in withholding of good time credit to the prisoner or loss of his opportunity to earn good time. Because of the importance of the question . . . and the frequency with which similar questions are being litigated . . . we are compelled to say that the district court was in error. All of the ele-

ments of due process recited by the district court are not necessary to the constitutionality of every disciplinary action taken against a prisoner. [However] if substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be premised on facts rationally determined. . . . In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him, * * * and afforded a reasonable opportunity to explain his actions. [Id. 442 F.2d at 198, 203.] [citations and footnotes omitted]

Carothers v. Follette, *supra*, decided prior to *Sostre*, reached much the same conclusion using much the same rationale:

In considering plaintiff's claim that the disciplinary procedure at Green Haven denies him due process, we recognize that prison officials are not dealing with a group of genteel citizens noted for their law-abiding characteristics. On the contrary most present a constant threat of unruliness and have already engaged in serious anti-social activities leading to their imprisonment. If essential prison discipline is to be maintained, therefore, prison officials must be given flexibility. . . . However, despite the peculiar and difficult problems inherent in prison administration, we cannot accept defendants' contention that the essential elements of fundamental procedural fairness—advance notice of any serious charge and an opportunity to present evidence before a relatively objective tribunal—must be dispensed with entirely because of the need for summary action or because the administrative problems would be too burdensome. [Id. 314 F.Supp. at 1027–28.] [citations omitted].

Unlike *Carothers*, defendants here concede the general requirements of *Sostre* and *Carothers*, confrontation with the accusation, informing the prisoner of the evidence against him, and affording him a reasonable opportunity to explain his actions.[10] It remains for this Court to determine what, if any, additional procedural due process standards are applicable and whether the present procedures at the Iowa State Penitentiary conform to such standards of due process.

■ In balancing the State interest in the disciplinary procedures as they conceive them against the alleged invarions of constitutional rights suffered by plaintiff Lathrop, the Court has carefully weighed all of the various factors and considerations suggested by Douglas v. Sigler, Cluchette v. Procunier, Sostre v. McGinnis and Carothers v. Follette, and concludes that Judge Kaufman is correct that in the penal context the basic rights that must be afforded are those that will at least give a prisoner ample notice of the pendency of a disciplinary proceeding and the nature of the infraction with which he is charged, a reasonable opportunity to present his side of the issue, and an impartial tribunal basing its decision on an unbiased record.[11]

■ Present practices at the Iowa State Penitentiary conform to this standard of due process. Although it might be preferable that a prisoner be given notice of charges pending against him and the nature thereof several days in advance of a disciplinary hearing, the officer investigating an infraction does visit the prisoner at some time in advance of his hearing, informing him of the pendent proceeding and of the charges against him by reading the report of the accusing officer. Although prisoners are not shown copies of the rule allegedly violated, they are given a copy of the prison rules and regulations upon

10. Defendants' Memorandum in Answer to Plaintiff's Amended and Supplemental Complaint, January 21, 1972, at 13.

11. Cf., also Bundy v. Cannon, 328 F.Supp. 165 (D.Md.1971).

their admission, and may not plead lack of knowledge thereof at some subsequent disciplinary proceeding, or lack of notice as a matter of due process. Glenn v. Wilkinson, 309 F.Supp. 411 (E.D.Mo. 1970). Furthermore, in a majority of cases, prisoners at Fort Madison do know that an accusing officer is filing a report, and so have informal notice well in advance of hearing.[12] Accordingly, the Court finds that present notice procedures at Fort Madison do not violate due process standards, and due process does not require defendants to show a prisoner a copy of the rules each time they are violated, although, as has been indicated, it is to be hoped that notice be given more in advance of hearing.

A much closer question is presented by those aspects of the Fort Madison procedures by which an adjustment committee bases its decision on a prisoner's statement and the reports of the accusing and investigating officers, without affording the prisoner the right to either confront or cross-examine his accusers, or to present testimony by others in his own behalf. In this context the Court is not unmindful that the Policies and Procedures Manual, Ch. IX (April 1970), of the Iowa State Penitentiary requires the adjustment committee to get "sufficient evidence upon which to base a decision," and further requires the investigating officer to present an "unbiased report." Given these requirements, the nature of the prison population, the example of Lathrop's response to the allegations made upon his second disciplinary infraction herein, and the indirect procedures decided upon by the prison authorities in their expertise, the Court cannot say that the State interest in avoiding possibly disruptive confrontations of prisoner and accuser is over-

come by the desirability of confrontation and cross-examination to the extent that they would be required as a matter of due process. Likewise, defendants in their discretion have decided upon the unbiased report of an investigating officer, together with the presence of the prisoner and the opportunity for him to make such statements as he may desire, as the optimum way of presenting the prisoner's side of a dispute to the adjustment committee, and the Court likewise cannot say that the interest in this procedure, a means to what defendants feel is a more orderly, less possibly abusable disposition of disciplinary problems, is overborne by prisoners' interest in having the opportunity to put on a full defense to disciplinary charges. Accordingly, the Court finds that present indirect methods of presentation of evidence in disciplinary proceedings at the Iowa State Penitentiary are not abusive of due process.[13]

The Court has no problems in this regard with the first disciplinary proceeding complained of herein, where plaintiff admitted his guilt. As to the second proceeding, however, plaintiff continually denied guilt of the infraction charged, and indicated to the prison authorities that he had witnesses to that effect. Upon being apprised of this denial, and of the alleged availability of witnesses, neither Lt. Eschman nor the investigating officer nor the Adjustment Committee made any attempt to contact these witnesses or to make any further investigation other than to ask the accusing officers if their original reports were true. Given this set of facts, the Court has a great deal of difficulty understanding how the report of the investigating officer could possibly be described as un-

---

12. Plaintiff did in fact receive such informal notice, at least in his second complained of disciplinary proceeding, and such a practice is to be encouraged and perhaps should even be formalized, as it is in California. Cf. Cluchette v. Procunier, supra.

13. This view is consistent with that taken in Adams v. Pate, 445 F.2d 105 (7th Cir. 1971) where disciplinary procedures in the Illinois prison system quite similar to those now in effect in Iowa were upheld against a similar procedural due process attack.

882

biased, or could even properly be deemed a report at all; it appears that the function of the investigating officer in this instance was wholly superfluous. Furthermore, the Court cannot comprehend how the Adjustment Committee could upon these facts be said to have had sufficient evidence when it arrived at its opinion. On the contrary, all the evidence that has been adduced indicates that it has become the common practice for prison officials to ignore their own regulations regarding unbiased reports and sufficient evidence in adjustment committee functions in that they have failed to provide any meaningful investigation where a prisoner denies commission of a disciplinary offense and asserts that he has evidence to support that denial.[14] Such being the case, it is incumbent upon the Court to determine that the decision of the Adjustment Committee to discipline plaintiff Harold A. Lathrop or this offense is arbitrary and capricious, a violation of administrative due process, and therefore null and void, Douglas v. Sigler, *supra*; Howard v. Smyth, *supra*; Queen v. South Carolina Dept. of Corrections, 307 F.Supp. 841 (D.S.C.1970); United States ex rel. Reis v. Leppig, 256 F.Supp. 881 (S.D.Fla. 1966), whereupon relief must be given plaintiff herein. This relief will take the form of ordering defendants to restore such good and honor time as was taken as a result of that decision, and to credit plaintiff for such good and honor time as would have been earned but for that decision, until such time as a new hearing after a *proper* investigation adequately determines the facts of plaintiff's alleged rule infraction and determines what, if any, good and honor time should properly have been deducted.

The Court wishes to express its appreciation to Lathrop's appointed counsel, Mr. Robert Bartels of Iowa City, for his thorough and excellent presentation of this matter.

---

14. Policies and Procedures Manual (April 1970), Ch. IX, Part II(c).