James PEARSON, Plaintiff,

v.

Harvey TOWNSEND et al., Defendants.

Jimmy HEARDE, Plaintiff,

v.

MEMBERS OF the INMATE ADJUST-
MENT COMMITTEE et al.,
Defendants.

Jimmy HEARDE, Plaintiff,

v.

SOUTH CAROLINA DEPARTMENT OF
CORRECTIONS et al., Defendants.

Civ. A. Nos. 72–1086, 72–1296 and 72–1427.

United States District Court,
D. South Carolina,
Columbia Division.

July 19, 1973.

Robert R. Madama, Jr., Legal Aid Service Agcy., Richard James Whitaker, S. C. Council on Human Relations, Herbert E. Buhl, III, American Civil Liberties Union, Columbia, S. C., for plaintiffs.

Daniel McLeod, Atty. Gen. of S. C., Columbia, S. C., for defendants.

## ORDER

SIMONS, District Judge.

Is an inmate confined in a state penal institution entitled to due process of law when he is charged with an infraction of the institution's rules? If so, how much due process must be afforded him? These are the broad general issues raised in these actions.

These matters have all been brought pursuant to 42 U.S.C. § 1983, by which plaintiffs generally allege that they have been deprived, under color of state law, of certain privileges and immunities guaranteed them by the Constitution and laws of the United States. Both plaintiffs contend that as a result of actions taken by the Inmate Adjustment Committee of the Central Correctional Institution, South Carolina Department of Corrections, they have been disciplined by being removed from the prisoner classification they formerly enjoyed and placed in a more restrictive status. Plaintiff Hearde's "sentence" also included one to fifteen days in punitive segregation and nine months in administrative segregation. They argue that before such deprivations may be visited upon them, they should be afforded a hearing comporting with minimal standards of due process. Generally they seek declaratory relief to the effect that they have not been afforded such due process, and injunctive relief to the effect that the defendants may not further discipline them and their fellow inmates without adequate due process hearings. They further contend that the due process provisions of the Inmate Guide of the South Carolina Department of Corrections, which governs disciplinary proceedings against all prison inmates is constitutionally deficient. Civil Action 72–1296 is brought as a class action; in civil action 72–1427 plaintiff Hearde seeks monetary damages from the defendants, alleging the same factual basis which gives rise to civil action 72–1296.

As these actions involve common questions of law, they were consolidated by Order of March 19, 1973, pursuant to Rule 42(c), Federal Rules of Civil Procedure. The Legal Aid attorneys who were already representing Hearde in 72–1296 were likewise appointed to represent him in 72–1427 and Pearson in 72–1086. Although attorneys for the parties indicated to the court at one time that there were no substantial issues of fact in dispute, attorneys for plaintiffs desired to present evidence to give the court an in-depth view of the circumstances giving rise to this litigation. Accordingly, a full evidentiary hearing was held before me in Aiken on April 4, 1973. Thereafter attorneys for the parties submitted proposed Orders and briefs.

### I

On July 9, 1972, plaintiff Hearde [1] was leaving his work in the Prison Industries section of Central Correctional Institution, carrying a rolled-up pair of trousers in his hand, when he was subjected to a "shakedown" by J. V. Taylor, a corrections officer. Officer Taylor found a knife concealed in the pants and charged Hearde with possession of contraband, a "major violation" of the prison rules as set forth in the "Inmate Guide," a publication of the Department of Corrections which is distributed to the inmates. On July 21, Hearde appeared before the Inmate Adjustment

---

1. Hearde is serving a twenty-five year sentence imposed on May 12, 1971, as a result of a conviction of armed robbery.

Committee. He was represented by Gene Hood, a law student employed by the Department as an "Inmate Representative" to defendant prisoners charged with violations of institutional rules. At the time of the hearing, Robert R. Madama, Jr., an attorney with the Legal Aid Service Agency, was present and ready to appear on Hearde's behalf, but was not permitted to represent Hearde. Officer Taylor, the prosecuting witness, was present at the hearing and presented his side of the controversy. Hood demonstrated to the members of the Committee that it could have been possible for the plaintiff to have carried the trousers without knowing of the knife's presence, thus asserting the defense of innocent possession. Hearde was asked if he would submit to a polygraph test; he agreed and the hearing was suspended pending the results of that test. On July 28, the hearing resumed. In the interim Warden J. W. Strickland had overruled the Committee's decision as to the polygraph test, and it was not given to Hearde. At the second hearing the Committee found Hearde guilty of possession of contraband and sentenced him to one to fifteen days confinement in punitive segregation and nine months confinement in administrative segregation. Hearde asserts that this infraction will be entered on his prison record and will be of detrimental effect in any attempt to gain parole. Hearde testified at the hearing that he served fourteen days in solitary confinement and over seven months in segregation before he was returned to "B" custody, the general medium classification of inmates. Hearde further testified that as a "B" custody inmate he had worked as a welder in the metal

shop, had played trumpet in a prison band, and was able to participate in recreational activities. These activities were not available while he was in administrative segregation imposed by the Committee.

On July 28, 1972, plaintiff Pearson [2] was a "AA" classification trusty, the least restrictive classification afforded any inmate. As such he was assigned to work as a driver for Prison Industries and was allowed to drive Department vehicles throughout the state. On that day he was charged with making an unauthorized stop while driving for Prison Industries, possession of currency in excess of that amount allowed by the Department rules, and illegal transportation of drugs. The drug charge was subsequently dropped as a result of the efforts of the Inmate Representative in his behalf. On August 25, 1972, Pearson appeared before the Inmate Adjustment Committee, represented by Hood and another Inmate Representative.[3] Pearson apparently admitted his guilt as to the two remaining charges, but pled justification in that at the time of the offenses he was selling leather goods which he had made while an inmate, and that the excess currency resulted from his sale of those goods. Pearson was found guilty of the two charges and sentenced to confinement in punitive segregation for one to fifteen days, reduced from "AA" custody to "B" custody, and made to forfeit the excessive currency. The sentence to punitive segregation was suspended. Pearson testified at this court's hearing that he felt that this adjudication by the Committee would have an adverse affect on his parole.

2. Pearson is serving a fifteen year sentence imposed on April 17, 1968, as a result of a conviction of safecracking.

3. It was represented to the court at the hearing of this matter that both Inmate Representatives had completed two years of law school at the time they represented plaintiffs herein before the Adjustment Committee. While that representation

appears to be true as to Hood, counsel for defendants subsequently informed the court that the other Inmate Representative had completed only one year of law school as of the summer of 1972, was not readmitted in the Autumn 1972 Term due to a deficient grade point average, but is eligible for readmission in September 1973, as a first-year student.

## II

■ The jurisdiction of this court in these actions is properly invoked pursuant to 28 U.S.C. § 1343(3) and (4) which gives district courts authority to entertain suits brought under 42 U.S.C. § 1983. The Supreme Court has recognized that a state prisoner who alleges a denial of due process when prison officials place him in a more restrictive confinement has stated a claim which, if supported by the evidence, may entitle him to relief under these statutes. Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

## III

Plaintiff Hearde initiated 72–1296 as a class action, on his behalf and on behalf of all other persons similarly situated, pursuant to Rule 23(a) and 23(b)(2), Federal Rules of Civil Procedure. Hearde contends that the members of the class which he represents are "all persons who have been or stand to be placed in a more restrictive status in the South Carolina Department of Corrections without having been present at a hearing" which comports with plaintiffs' concept of due process of law. The purpose of seeking recognition of this suit as a class action is so that whatever final injunctive and declaratory relief decreed by this court, if any, will be applicable to the class as a whole. The defendants do not oppose these cases being maintained as class actions.

■ The court is required under Rule 23(c)(1) to determine by order whether the class action is to be so maintained. In making such a determination, the court must consider whether the action meets the requirements set forth in Rule 23(a) and whether it falls within one of the three categories of class suits provided for in Rule 23(b). A district court has broad discretion in deciding whether to allow the maintenance of a class action. It has been said that subdivision (b)(2) was added to Rule 23 as part of the 1966 amendments so that civil rights suits for injunctive relief could be brought as class actions: "[T]he class suit is a uniquely appropriate procedure in civil rights cases, which generally involve an allegation of discrimination against a group as well as the violation of rights of particular individuals. Moreover, by their very nature, civil rights class actions almost invariably involve a plaintiff class." Wright & Miller, Federal Practice and Procedure § 1776.

A class action may be maintained under Rule 23(b)(2) if (1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; (4) the representative parties fairly and adequately protect the interests of the class; and (5) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

■ In support of their contention that the suit should be maintained as a class action, the plaintiffs make the following assertions with regard to the five requirements listed above: (1) The number of inmates who have experienced restrictions at the hands of the Adjustment Committee is great, as testimony at the hearing was to the effect that fifteen to twenty disciplinary adjudications are made every week at the Central Correctional Institution. (2) All members of the class are subject to the same procedure since all inmates accused of "major" rule violations as classed by the "Inmate Guide" are brought before the Adjustment Committee for a determination of their cases. (3) The named plaintiffs were charged with a violation of institutional rules, brought before the Adjustment Committee for an adjudicatory hearing, and as a result sentenced to some curtailment of their prior custodial status. Such claims could likewise be made by any other inmate who has been so disciplined

by the Committee. (4) The named plaintiffs are sufficiently interested in their claims to be forceful advocates of their positions, as was illustrated by their testimony at the hearing, and they are represented by counsel who have the resources and experience in this particular area of the law to adequately represent the plaintiffs and the purported class. (5) The defendants have acted on grounds generally applicable to the class, in that they uniformly apply the procedures outlined in the "Inmate Guide" to all hearings before the Adjustment Committee,[4] so that a determination of those rules' constitutionality with respect to due process will apply to the class as a whole.

Accepting these grounds as sufficient, the court takes cognizance of this action as a class action.[5]

4. Defendants' Answer to plaintiff's Request for Admissions, request no. 17, in Civil Action No. 72–1296, filed with the court on December 6, 1972.

5. The court is aware that there are other prisoner petitions pending before this court asserting generally the same allegations as in these petitions. Those petitions before this member of the court will be disposed of in accordance with the decision arrived at herein. Any future petitions referred to this member of the court for decision making similar allegations will likewise be disposed of in accordance with this Order. The court has no reason to believe other than that the defendants herein would follow the dictates of this Order in any future suit brought to which they would apply. Thus it seems somewhat pointless to seek to classify the within suits as class actions, but the court is nevertheless of the opinion that they are entitled to that effect.

6. "C. MAJOR VIOLATIONS OF RULES: Major violations will include misconduct which constitutes a direct danger to persons or property, to the security of the institution, or a series of repeated minor infractions. If you have a major violation it will be reviewed by the Chief Correctional Supervisor and referred to the Adjustment Committee. A copy of the infraction report will be given to you.

"The Adjustment Committee at the Central Correctional Institution will have the following composition:

## IV

The real nexus of these suits is the procedure governing disciplinary actions as set forth in the "Inmate Guide," 1972 revision. The defendants contend that these guidelines embrace all the due process to which prisoners subject to discipline for violation of institutional rules are entitled. The plaintiffs contend that these guidelines fall short of minimal due process. Counsel for plaintiffs stated in oral argument that generally there is no issue that these guidelines are applied as they are written. Thus the initial inquiry is as to what procedures are provided in the Department's own regulations.

The complete text of the "Inmate Guide" as is applicable to the instant controversies is set out in the margin.[6]

a. Only one deputy warden shall be on the Committee. A deputy warden will be a committee member on a rotating basis and the deputy warden will always be Chairman of the Committee.
b. A member of the Division of Industries shall be one of the members of the committee.
c. The Institutional Classification Officer should be a member of the Committee.
d. The Administrative Assistant to the Warden will act as a non-voting recorder for the Committee.
e. There should be two additional members on the Committee who are entirely free from prison administration. (Persons such as correctional officers, chief correctional officers, deputy wardens, and administrative assistants to the wardens, are considered members of the prison administration.) Every effort will be made to have a minimum of two minority members of the Committee present at all times.
f. A member of the Youthful Offender Division shall be a member of the Committee whenever a Youthful Offender is involved.

"Due to the appeals procedure, the Warden will not sit on the Adjustment Committee. Persons involved in an infraction or persons who are preferring the charges will not be members of the Committee.

"WITNESSES: The person (correctional officer, deputy warden, warden, et cetera) preferring charges against the ac-

In summary, violations of the rules are classed according to the seriousness of the violation into four categories: "minor violations of nonconformance," "minor violations of rules," "major violations of rules," and "major violations of laws." The first two are disposed of administratively. Only "major violations of rules" are referred to the Adjustment Committee for disposition. The fourth category is referred to the County Court for criminal prosecution.

The Adjustment Committee is chaired by a deputy warden on a rotating basis. Two additional members of the Committee come from the prison administration. Two other members of the Committee

cused shall be available to appear before the Adjustment Committee and you shall be permitted to confront and/or question the individual preferring charges.

"COMMITTEE DECISIONS: The decision of the Adjustment Committee will be based solely on the evidence presented to it at the hearing. The Committee may take one or more of the following actions:

1. Dismissal of the report.
2. Reduction of the report.
3. Punitive segregation for an indeterminate period not to exceed 15 days.
4. Administrative segregation for an indeterminate time not to exceed a specific time period. (For example: a man may be sentenced to from one to three months. In such a case, the man would have to serve at least one month, but would not serve longer than three months and may be released any time after one month is served.)
5. Reduction in custody.
6. Loss of privileges.
7. Refer violation to the Court for disposition.
8. Recommend to the Director loss of all or part of accrued Good Time.

. . . . .

"You shall not be brought before the Adjustment Committee solely on the basis of statements or affidavits from other inmates. If accused you will have a polygraph ("lie detector") test administered to you if you so request, or your accuser will be administered the test.

"There should be no exception to the rule that you be given detailed notice in writing of the charges against you at least forty-eight hours prior to the hearing. Failure to provide such notice will require dismissal of the charges.

"a. You shall not be held in administrative segregation pending your hearing unless the nature of the charge indicates that you may constitute a danger to other inmates or prison security if allowed to remain in the general inmate population. If you are thought to be such a danger and are thereby placed in administrative segregation, your hearing should be given priority over other cases and be heard at the next meeting of the Adjustment Committee. If you are placed in administrative segregation pending an investigation, the investigation shall be completed as soon as practical and you shall be given priority over other routine cases and be heard at the next meeting following the completion of the investigation.

"b. If accused, you shall be permitted to have representation at the Adjustment Committee hearing.

"If you should be appearing before the Adjustment Committee, you will be given a physical examination by the medical staff prior to appearing before the Committee.

"INMATE REPRESENTATIVE: If you so request, you will be provided with someone to assist you in preparing your case to present to the Adjustment Committee. At the Central Correctional Institution, Manning Correctional Institution, and Harbison Correctional Institution for Women, person(s) will be employed in this capacity. At the outlying institutions, members of the staff (excluding correctional officers) will be available to provide assistance for you. A list of staff members who are available to represent you will be available to you. If you do not wish to be represented by the next person on the list of employees, you may reject this person and select the next person on the list. However, you will not be permitted to randomly select anyone on the list you want to represent you. The persons who will assist you will be fact finders, in that their responsibility will be to interview you, your witnesses, and other persons involved in the particular incident so that the representative may attempt to determine exactly how the incident occurred; he will be expected to present his findings to the Adjustment Committee as he determined from his investigation.

"APPEALS: You may appeal the decision of the Adjustment Committee to the Warden of your institution, then the Assistant Director for Institutional Operations, and finally to the Director of the Department of Corrections."

are to be persons "entirely free from prison administration." It is specifically provided that persons involved in an infraction, or persons preferring the charges, will not sit as members of the Committee in such a case. The person preferring the charges against the prisoner "shall be available to appear" before the Committee and the accused "shall be permitted to confront and/or question the individual preferring charges." The Committee's decision is to be based solely on the evidence. Maximum punishments which may be meted out upon a finding of guilty include punitive segregation for a maximum of fifteen days, administrative segregation for an indeterminate period, reduction in custody, loss of privileges, and a recommendation to the Director of the Department that all or part of accrued good time be revoked. Twenty specific offenses punishable by Adjustment Committee action are listed in the "Guide," together with the maximum sentence which may be imposed for each offense. Although the rule is not written with precision, it is inferable that the accused's request that either he or his accuser be administered a polygraph test will be honored. The accused must be given written notice of the charges against him at least forty-eight hours prior to the hearing, or otherwise the charges will be dismissed. An accused is not to be held in administrative segregation pending his hearing unless he would pose a danger to other inmates or to prison security if left in the general population. If he is segregated prior to the hearing, his hearing is to be given priority over other cases. An accused "shall be permitted to have representation at the Adjustment Committee hearing." If the accused requests assistance, an Inmate Representative is provided to help him present his case to the Committee. Though not specified in the "Guide," it appears to be the practice of the Department to employ law students to serve in this capacity. Finally, a prisoner may appeal the Adjustment Committee's decision first to his institu-

tional warden, next to the Assistant Director of the Department for Institutional Operations, and finally to the Director of the Department of Corrections.

In addition to the procedures codified in the "Guide," evidence adduced at the hearing of this matter indicates that certain other rules, though not reduced to writing, are established and followed in Adjustment Committee hearings. One of these unwritten rules of procedure is that fellow inmates of the accused are not normally permitted to testify before the Committee as witnesses on the accused's behalf. However, such testimony may be brought before the Committee through the oral statements of the Inmate Representative defending the accused, or through affidavits. The Inmate Representative, on behalf of the accused, can cross-examine the prosecuting witnesses. The cross-examination is limited to the extent that the accused's representative cannot attack a Department official's credibility in the presence of the accused; however, the accused can be excused from the hearing for such an inquiry to take place. Apparently the philosophy giving rise to this rule is that a corrections officer should not be degraded in front of an inmate. The accused himself is apparently not permitted to directly question his accuser, but may do so only through his representative. And although the accused is by the rules "permitted to have representation," apparently this representation is limited solely to the Inmate Representatives provided by the Department; the Department does not allow retained counsel to appear on behalf of an accused.

Plaintiffs assert that the due process to which they are entitled before they may be disciplined for a major infraction of prison regulations includes the following six elements: (1) adequate notice of the charges against the accused; (2) a hearing before an impartial tribunal; (3) the participation of counsel on behalf of the accused; (4) the opportunity to confront and cross-examine

opposing witnesses, and the opportunity to present evidence favorable to the accused, including the testimony of favorable witnesses; (5) a written decision based solely on the evidence adduced at the hearing; and (6) the right to appeal to an administrative official independent of the Department of Corrections. Insofar as the procedures established in the "Inmate Guide" fall short of these criteria, plaintiffs contend that they are constitutionally deficient. Defendants assert that the procedures already established comport with the minimal requirements of due process of law applicable in such an environment.

## V

Until very recently, disciplinary action taken by prison officials in the exercise of their discretionary power to maintain order, discipline and security among the prison population was regarded as an area not subject to judicial review.[7] But the past few years have seen an increased judicial activism in the area of prisoner rights, with a resulting erosion of the old "hands-off" doctrine:

> "Previously an area in which the courts utilized the 'hands off' ap-

proach, the types of disciplinary methods permissible in order to maintain security and the procedures which must accompany punishment are being scrutinized by the courts against the evolving concepts of due process of law from the Fourteenth and Fifth Amendments and the prohibition against cruel and unusual punishment of the Eighth Amendment. Perhaps even more than in other areas, the dynamic changes occurring in court decisions in correctional cases are in response to the expanded standards already established elsewhere in the law.

.    .    .    .    .    .

"Perhaps the area of greatest upheaval in the law of corrections is the continuing controversy over what kind of disciplinary methods may be used in order to maintain prison discipline and security and what procedures must accompany the imposition of the sanctions. Since the abrogation of the 'hands off' doctrine, the courts have been increasingly sensitive to claims of inmates that they have not been dealt with in the manner required by the Constitution of the United States. The two focal points

---

7. This view was recently expressed by the South Carolina Supreme Court in a case practically identical to the instant actions. In Sellers v. State, 193 S.E.2d 513 (S.C. 1972), several inmates of the Central Correctional Institution who had been sentenced by the Adjustment Committee to loss of good time credit and indefinite administrative segregation sought to have those penalties set aside on the grounds that the procedures under which the punishment was imposed failed to meet the standards of due process. The state trial court, following an evidentiary hearing, held that the inmates had been deprived of good time without due process, and ordered the imposition of the penalty of loss of good time set aside. As to the punishment to administrative segregation, the lower court ruled that the procedural protection afforded the prisoners was sufficient. The Supreme Court was careful to point out that the state abandoned its appeal as to the portion of the lower court order restoring the good time credits, so that the high court was concerned

only with the prisoners' appeal as to the trial court's order upholding the imposition of administrative segregation. With the case in that posture, the South Carolina court decreed:

"The disciplinary action in this case involved the good faith exercise of the discretionary power of the prison officials in the maintenance of order, discipline, and security among the prison population and, as such, is not subject to judicial review. . . . [T]here is no proof that [the prison officials] acted arbitrarily, capriciously or from personal bias or prejudice. The evidence shows that the determination was made in good faith and concerned routine disciplinary action in prison administration. Such actions of prison officials are not subject to judicial review." 193 S.E.2d at 515.

Thus the prisoners' contentions that they were denied elements of due process, similar to the elements urged by plaintiffs here, went unanswered on the merits.

of prisoner complaints in this area are the Due Process clauses of the Fifth and Fourteenth Amendments and the Prohibition against Cruel and Unusual Punishment of the Eighth Amendment. This indicates that the controversy will be a continuing one and not subject to ultimate settlement." South Carolina Department of Corrections, The Emerging Rights of the Confined, at 12, 102 (1972).

More generally, the Supreme Court in several decisions during the past five years has extended the application of elements of due process into varied contexts where private rights are threatened by public action. Perhaps the most significant of these decisions has been Goldberg v. Kelly, 397 U.S. 254, 90 S. Ct. 1011, 25 L.Ed.2d 287 (1970), holding that a welfare recipient is entitled to an evidentiary hearing encompassing enumerated due process procedures before welfare benefits are terminated. Other decisions extending the umbrella of procedural due process include Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), declaring violative of due process a Wisconsin prejudgment garnishment procedure; Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), condemning the practice of "posting" the names of persons in liquor stores to prevent their buying liquor without such persons being afforded notice and an opportunity to be heard; Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), declaring that before a driver's license may be suspended under the Georgia Motor Vehicle Safety Responsibility Act, the state must afford the driver procedural due process; Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), mandating due process in replevin ac-

tions, and Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), suggesting that a nontenured state teacher should be afforded a due process hearing prior to the nonrenewal of his contract if he could show that such nonrenewal deprived him of an interest in "liberty" or "property." Plaintiffs' obvious analogy in the instant case is that if procedural due process attaches to the situations involved in the cases cited above, then it must likewise attach to the case of a prisoner who is threatened with the loss of some of the "liberty" he is afforded within the penitentiary because of an alleged violation of prison regulations.

Satisfied that some quantum of procedural due process is indeed required in the prison environment, the court next turns to cases which have wrestled with the specific inquiry of how much process is due. There are no cases of the Supreme Court[8] or of the Fourth Circuit which speak directly to this narrow issue. Thus consideration must be given to decisions in related areas, such as parole and probation revocation. The court is also mindful of decisions from other Circuit Courts of Appeals, and from other district courts within the Fourth Circuit area, which have decided the issues here presented. However, no attempt is made to catalogue every decision relating to this burgeoning area of the law.

Although there are no Fourth Circuit cases specifically dealing with due process in the prison environment, this circuit has inferred for some time that some measure of procedural safeguards should attach to prison life. Thus the court commented as early as 1961:

> "It is beyond dispute that certain rights and privileges of citizenship are withdrawn from prisoners, but it

---

**8.** Although the Supreme Court has yet to rule on the merits of the question of what due process must be afforded to prisoners charged with institutional rules infractions, it has in two recent per curiam decisions reversed lower court dismissals on purely procedural grounds of such

cases, suggesting that a determination on the merits is appropriate. Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971), Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

has never been held that upon entering a prison one is entirely bereft of all of his civil rights and forfeits every protection of the law." Sewell v. Pegelow, 291 F.2d 196 (4th Cir. 1961), at 198.

In Howard v. Smyth, 365 F.2d 428 (4th Cir. 1966), cert. denied 385 U.S. 988, 87 S.Ct. 599, 17 L.Ed.2d 449 (1966), a state prisoner sought his release from the maximum security ward of the prison. The court found that the prison had summarily ordered this move, without a hearing, as a result of the prisoner's request for religious services. Recognizing that courts "have been reluctant to interfere with the conduct of prisons, with the enforcement of their regulations, or their discipline," the court found that this prisoner had been arbitrarily punished, and ordered the prisoner released from maximum security and placed with the rest of the prison population. In Landman v. Peyton, 370 F.2d 135 (4th Cir. 1966), cert. denied 385 U. S. 881, 87 S.Ct. 166, 17 L.Ed.2d 108 (1966), 388 U.S. 920, 87 S.Ct. 2142, 18 L.Ed.2d 1367 (1967), 392 U.S. 939, 88 S.Ct. 2315, 20 L.Ed.2d 1399 (1968), rehearing denied 393 U.S. 900 (1968), cert. denied 395 U.S. 915, 89 S.Ct. 1763, 23 L.Ed.2d 229 (1969), the Fourth Circuit affirmed the district court's dismissal, following a lengthy evidentiary hearing, of a prisoner petition seeking release from maximum security and restoration to the general prison population. But the court was concerned over the apparent lack of prison supervision over guards in the maximum security wing: "Where the lack of effective supervisory procedures *exposes men to the capricious imposition of added punishment,* due process and Eighth Amendment questions inevitably arise." 370 F.2d at 141; emphasis supplied. In West v. Cunningham, 456 F.2d 1264 (4th Cir. 1972), the court hinted at what it may require as elements of due process. The only issue in the case was whether a prisoner's release from maximum security mooted his § 1983 petition. Since the prisoner asserted that his alleged illegal punitive confinement jeopardized his future chances for parole, the Fourth Circuit held that the petition was not moot, reversing the district court. The court's dictum—"If, as West alleges, he has been punished in an arbitrary manner, without a hearing, without specification of the charges against him and without an opportunity to defend himself"—suggests the minimum essentials of due process. Finally, in Breeden v. Jackson, 457 F.2d 578 (4th Cir. 1972), it was suggested that the federal courts should interfere with the regulation of prisons only if federal constitutional questions are raised:

"While modern authority has considerably broadened prisoner's rights, prison discipline remains still largely within the discretion of the prison authorities and federal courts will interfere only where paramount federal constitutional or statutory rights intervene. . . . It is only when the deprivations of prison confinement impose conditions of such onerous burdens as to be of constitutional dimensions that courts may intervene in prison management. So long as the rules of prison management are 'not so unreasonable as to be characterized as vindictive, cruel or inhuman,' so long as they 'are necessary or reasonable concomitants of imprisonment,' so long as the regulations do not involve punishment or restraints 'intolerable in fundamental fairness,' so long as the rules are not exercised 'in such a matter to constitute clear arbitrariness or caprice,' no constitutional rights are infringed." 457 F.2d at 580–581, footnotes omitted.

The probable genesis of much of the litigation over prisoners' rights to procedural due process was the heralded order of Judge Constance Baker Motley in Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y.1970). The court held that the plaintiff-prisoner had been "sentenced to more than a year in punitive segregation without the minimal procedural safeguards required for the imposition of such drastic punishment upon a

prisoner," and decreed that minimal due process in such a situation called for written notice of the charges, a hearing before an impartial official with right to cross-examine accusers and call witnesses in rebuttal, a written record of the decision and reasons therefor, and retained counsel or counsel substitute. Additionally, the court awarded plaintiff $25 per day for every day spent in punitive segregation (372 days), plus $10 per day punitive damages for the "bad faith and malice" shown by the prison officials against the petitioner. Undoubtedly this award of damages in excess of $13,000 stimulated prisoner interest in such suits.[9]

The crusading nature of the district court decision was circumscribed to some extent on appeal to the Second Circuit. In Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971) (en banc) which has become recognized as one of the most authoritative decisions in this area, the court discussed at some length the procedural elements prescribed by the district court. It concluded with the following oft-quoted passage:

"We therefore find ourselves in disagreement with Judge Motley's conclusion that each of the procedural elements incorporated in her mandatory injunction are necessary constitutional ingredients of every proceeding resulting in serious discipline of a prisoner. In thus rejecting Judge Motley's conclusions, however, we are not to be understood as disapproving the judgment of many courts that our constitutional scheme does not contemplate that society may commit lawbreakers to the capricious and arbitrary actions of prison officials. If substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be premised on facts rationally determined. This is not a concept without meaning. In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him, . . . and afforded a reasonable opportunity to explain his actions." 442 F.2d at 198, citations omitted.

The Seventh Circuit has very recently considered the questions here presented, and its opinion is valuable in that it succeeds in point of time the Supreme Court holding in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), discussed *infra,* which prescribed the minimal due process requirements for a parole revocation hearing. In Miller v. Twomey, 479 F.2d 701 (1973), a divided Seventh Circuit panel held that certain of the due process principles of *Morrissey* should also apply to the "grievous loss" of relative liberty that a prisoner suffers when he is deprived of earned good time or placed in punitive segregation. Noting that *Morrissey* did not directly dispose of such prisoner complaints, that decision was seen as requiring "that due process precede any substantial deprivation of the liberty of persons in custody." The court gave separate consideration to disciplinary proceedings which resulted in the revocation of good time credits, and to those which resulted only in punitive segregation. As to the former, the court established the following due process guidelines:

"Plainly, an in-prison disciplinary proceeding may be at least as informal as a parole revocation hearing. Thus, there is no absolute right to confront or to cross-examine witnesses; it is doubtful that counsel or a lay substitute is essential. As a minimum, however, the prisoner must receive adequate advance written notice of the charges against him, he must be afforded a fair opportunity to explain his version of the incident, and, to insure a degree of impartiality, the

9. One similar prisoner *pro se* petition currently pending before this court includes a copy of a newspaper report of the district court decision in *Sostre,* attached as part of the prisoner's complaint.

factual determination must be made by a person or persons other than the officer who reported the infraction. . . . [W]e merely hold that the Constitution requires, as a bare minimum, advance written notice, a dignified hearing in which the accused may be heard, an opportunity to request that other witnesses be called or interviewed, and an impartial decision maker." 479 F.2d at 715.

As to disciplinary proceedings resulting only in punitive segregation, without any loss of good time, the *Miller* court opined, "Quite obviously not every adverse change in a prisoner's status, even assuming it impairs his residuum of liberty, is sufficiently 'grievous' to amount to a constitutional deprivation." Conceding, however, that prolonged segregated confinement does amount to a "grievous loss," the court held that in any case involving such a loss, such as cases involving major rule infractions for which severe punishments are possible, the minimal due process elements established for deprivation of good time would also apply. The Seventh Circuit left to its district courts to determine "precisely what measure of punishment is sufficiently severe to bring the due process requirement into play."

District courts in Maryland, Virginia and North Carolina have recently had occasion to consider similar suits as the ones now before this court.[10] In Bundy v. Cannon, 328 F.Supp. 165 (D.Md.1971; Thomsen, J.), the court found the prison administration's methods deficient in the following areas:

"The procedures followed in the instances where the inmate was charged with an infraction of the rules did not afford him: (1) adequate notice of the alleged misconduct or of the time when the hearing would be held; nor (2) an opportunity to question the person charging him with an offense or to present witnesses on his own behalf; nor (3) an impartial "Adjustment Team," since the correctional officer pressing the charge was a member of the Adjustment Team which heard his case." 328 F.Supp. at 172.

During the pendency of the *Bundy* litigation, the Maryland Division of Correction promulgated new rules for adjustment procedures which remedied the deficiencies noted by the court. In Landman v. Royster, 333 F.Supp. 621 (E.D. Va.1971; Merhige, J.), the court in a lengthy opinion concluded that the following "due process rights" were required before prisoners were disciplined: (1) decision by an impartial tribunal, (2) a hearing, including the right to cross-examine and to present evidence in defense, with the hearing preceded by a written notice of the charge, (3) the decision to be based on evidence presented at the hearing, and (4) the right of the prisoner, if unable to represent himself, to select a lay advisor to present his case. The court did not require an appellate procedure. Noting that there "is no requirement that the state provide legal aid" in such a case, the court nevertheless stated that "where substantial sanctions are possible and the assistance of counsel may be of benefit, retained counsel is necessary.

---

10. A similar situation was also presented to this court three years ago in Queen v. South Carolina Department of Corrections, 307 F.Supp. 841 (D.S.C.1970). In that case Judge Russell, then of this court, dismissed three prisoner petitions complaining of arbitrary and discriminatory treatment:

"[I]t seems settled that 'routine security measures and disciplinary action rests solely in the discretion of the prison officials' and 'the necessity for effective disciplinary control is so impelling that judicial review of them is

highly impractical and wholly unwarranted.' Absent unusual circumstances involving . . . . some infringement of constitutional rights . . . ., courts are not available for review of prison administration . . . . " 307 F.Supp. at 845, footnote omitted.

In view of the rapid development of the law in this area since *Queen*, this court feels that dismissal of the instant petitions on a basis of the unavailability of the federal courts to review prison administration under such circumstances as presented here would be inappropriate.

. . ." 333 F.Supp. at 654.[11] In Worley v. Bounds, 355 F.Supp. 115 (W. D.N.C.1973; McMillan, J.), the most recent case in this regard arising from the Fourth Circuit area, the court held that under the circumstances of the particular incident treated there—the prisoner-plaintiff was charged with "agitating" —the prisoner was entitled to the following elements of due process: (1) a written copy of the charges, (2) confrontation with his accuser, (3) an opportunity to explain his actions, and (4) a written explanation of the decision of the hearing officers.

Though the Supreme Court has not yet had occasion to pass on the specific issues presented herein, it has recently handed down opinions in the related areas of parole and probation revocation. In Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the Court considered whether the due process clause of the Fourteenth Amendment required a state to afford an individual an opportunity to be heard prior to the revocation of his parole. Noting that whether any procedural protections are due depends on the extent to which an individual may suffer grievous loss, the court said that due process was flexible and "calls for such procedural protections as the particular situation demands." Declining to write a code of procedure, the court instead listed the minimum requirements of due process:

> "They include (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good

cause for not allowing confrontation) ; (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole. We emphasize there is no thought to equate this second stage of parole revocation to a criminal prosecution in any sense. It is a narrow inquiry; the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." 408 U.S. at 489, 92 S.Ct. at 2604.

The Court specifically refrained from deciding whether a parolee in such a situation would be entitled to the assistance of retained counsel, or to appointed counsel if he were indigent.

The Court recently disposed of that issue in Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). This decision initially determined that a probationer who was being subjected to the revocation of his probation was entitled to the same due process considerations afforded a parolee in *Morrissey*. The court then rejected the contention that the state was under a constitutional duty to provide counsel for indigents in all probation or parole revocation cases. For, as the Court said, "[W]e deal here not with the right of an accused to counsel in a criminal prosecution, but with the more limited due process right of one who is a probationer or parolee only because he has been convicted of a crime." 411 U.S. at 789, 93 S.Ct. at 1763. Thus the court ruled that a decision as to the need for counsel in such cases "must be made on a case-by-case

11. In recently-published sequels to Landman v. Royster, the court found that the Virginia prison officials had knowingly failed to abide by the due process guidelines set forth in its 1971 Order, held them in civil contempt, and imposed a conditional $25,000 fine on such defendant officials. 354 F.Supp. 1292 (E.D.Va.

1973). In proceedings to determine damages arising out of the complaints treated in the original Order, the court awarded a total of $21,265.45 to three prisoners for "cruel and unusual punishment by Virginia prison authorities." 354 F. Supp. 1302 (E.D.Va.1973).

basis in the exercise of a sound discretion by the state authority," and it implied that only in a minority of such cases would the state have to provide counsel at its own expense.[12]

In a recent habeas corpus petition appealed to the Fourth Circuit, wherein the petitioner contended he was not afforded the right of confrontation of adverse witnesses in his probation revocation hearing, the court concluded that the right of confrontation provided by *Morrissey-Gagnon* means that where the prisoner so demands, the prosecuting witnesses must be presented for cross-examination, "unless, as the right of confrontation is limited, 'the hearing officer specifically finds good cause for not allowing confrontation.'" *Foy v. Bounds,* 481 F.2d 286 (4th Cir. 1973).

## VI

Employing the foregoing review of authorities as a guide, the court turns to the six elements of due process proposed by the plaintiffs for a point-by-point determination of their validity.

■ A. *Notice.* The Department of Correction's procedural rules as stated in the "Inmate Guide" provide for a minimum of forty-eight hours notice in writing of the charges against an accused prior to his hearing. Plaintiffs concede that adequate notice was given in the cases at hand, and do not contend that the notice provision of the Department's rules is deficient. Thus all parties agree that the present procedure is in compliance with the requirements of due process.

■ B. *Hearing Before An Impartial Tribunal.* The Adjustment Committee, as described in the "Inmate Guide," includes among its voting membership three persons from the prison administration and two persons "who are entirely free from prison administration." It is also provided that persons preferring

charges or otherwise involved in the infraction being considered are not to sit as Committee members. Plaintiffs advocate as a further requirement that no Committee member should have a superior-subordinate relationship with the accuser. The court takes this to mean that if the accuser is a prison employee —guard, industry supervisor, or administrator—no one above him in the prison administration "chain of command" should sit on the panel. Plaintiffs rely on Colligan v. United States, 349 F. Supp. 1233 (E.D.Mich.1972), wherein a similar requirement was laid down by the court, on the grounds that such was "necessary to eliminate the possible 'command influence' which would otherwise be inherent in such a situation." 349 F.Supp. at 1237. This court is not persuaded that such a requirement is part of the minimal due process which must be afforded. Neither Goldberg v. Kelly nor Morrissey v. Brewer espouses such a requirement:

> "The granting and revocation of parole are matters traditionally handled by administrative officers. In *Goldberg,* the Court pointedly did not require that the hearing on termination of benefits be conducted by a judicial officer or even before the traditional 'neutral and detached' officer; it required only that the hearing be conducted by some person *other* than one initially dealing with the case." Morrissey v. Brewer, *supra,* 408 U.S. at 486, 92 S.Ct. at 2603.

The composition of the Adjustment Committee, as specified in the "Inmate Guide," satisfies the requirements of due process as it relates to an impartial tribunal in a penal administrative setting.

C. *Participation of Counsel on Accused's Behalf.* Like the concept of due process of law, the right to counsel has recently been afforded expansive interpretation. In Gideon v. Wainwright,

12. The Fourth Circuit mandated the same result as Morrissey v. Brewer and Gagnon v. Scarpelli for parole revocations in Bearden v. State of South Carolina, 443 F.2d 1090 (4th Cir. 1971), including the adopting of a case-by-case approach to the furnishing of counsel.

372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), the Court held that the right of an indigent criminal defendant to the assistance of counsel was a fundamental right essential to a fair trial. The right was extended to juveniles by In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L. Ed.2d 527 (1966). Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), held that where an investigation had focused on a suspect in custody, that suspect could not be denied the assistance of counsel. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966), expanded *Escobedo* and required that such a suspect be advised of his right to counsel. A post-indictment lineup was adjudged a critical prosecutive stage at which an accused was entitled to aid of counsel in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967), the Court held that a probationer is entitled to be represented by appointed counsel at a combined revocation and sentencing hearing, as counsel is required "at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected." Argersinger v. Hamlin, 407 U. S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), stands for the proposition that counsel is required when loss of liberty as a result of any criminal prosecution is threatened. The importance of counsel, if not the absolute right to same, has been recognized also in the area of administrative due process. In Goldberg v. Kelly, *supra,* the Court said:

> " 'The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel.' Powell · v. Alabama, 287 U.S. 45, 68–69 [53 S.Ct. 55, 64, 77 L. Ed. 158] (1932). We do not say that counsel must be provided at the pre-termination hearing, but only that the recipient must be allowed to retain an attorney if he so desires. Counsel can help delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination, and generally safeguard the interests of the recipient. We do not anticipate that this assistance will unduly prolong or otherwise encumber the hearing." 397 U.S. at 270–271, 90 S.Ct. at 1022.

However, Gagnon v. Scarpelli, *supra,* has established that there is no constitutional right of persons convicted of crime to have counsel in the context of probation or parole revocation hearings; instead, the court mandated a case-by-case approach for determining when counsel should be appointed, and it noted that "the presence and participation of counsel will probably be both undesirable and constitutionally unnecessary in most revocation hearings."

The procedure now before the court for review provides that the accused is to be permitted to have representation at the Committee hearing, and that at the accused's request, he will be furnished an "Inmate Representative" to assist him in preparing his case. Such an "Inmate Representative" is, in the words of the plaintiffs' brief, a "counsel-substitute;" the representatives employed at the time of plaintiffs' hearings were law students. Plaintiffs contend that as these "counsel-substitutes" are employees of the Department of Corrections, they are not in a sufficiently independent position to vigorously represent inmate defendants. However, the court perceives the posture of the "Inmate Representative" as no different from a public defender, who is employed by the state or a political subdivision thereof to defend those charged by the state with criminal violations.

In short, the court is convinced that due process does not require that counsel be provided to every accused who must appear before the Adjustment Committee. *Cf.* Sostre v. McGinnis, *supra;* Landman v. Royster, *supra.*[13]

13. Under the guidelines of Gagnon v. Scarpelli, *supra,* this court does not hold that the Department may refrain from appointing counsel to an indigent accused

Thus the current Department policy of providing an "Inmate Representative" in the form of a law student to inmates who request assistance certainly satisfies the requirements of minimal due process. And as the "Inmate Guide" procedure specifies that an accused "shall be permitted to have representation," such provision can only be construed as meaning that an accused who has retained counsel must be permitted to have such counsel present his case to the Committee. Thus, under its own rules, the Department must allow the inmate to retain counsel if he so desires.

D. *Confrontation and Cross-Examination of Opposing Witnesses; Presentation of Favorable Witnesses.* The procedure until review provides that the person preferring charges "shall be available to appear before the Adjustment Committee and you [the accused] shall be permitted to confront and/or question the individual preferring charges." Clearly the right of confrontation and cross-examination is preserved in the current procedure. Plaintiffs appear to assert two major contentions in this area: (1) the right to cross-examination is impermissibly limited, in that the accuser's credibility can be impeached only in the absence of the accused, and the cross-examination must be done by the accused's representative rather than by the accused himself; and (2) the testimony of favorable witnesses is normally limited to an affidavit or to a statement of that witness' testimony by the accused's representative.

But the cases have held that cross-examination and the presentation of witnesses may be appropriately limited in proceedings of this type. In Sostre v. McGinnis, *supra,* the Second Circuit said:

"[T]he evidence as to whether the prisoner has violated a prison regulation is likely to be simpler, more precise, and more readily at hand, than, for example, the evidence bearing on the question whether welfare payments should be terminated. There is correspondingly less need for cross-examination and calling of witnesses." 442 F.2d at 196–197.

The Seventh Circuit in Miller v. Twomey, *supra,* decreed that "there is no absolute right to confront or to cross-examine witnesses" in a prisoner disciplinary hearing. And the Fourth Circuit, in Foy v. Bounds, *supra,* has said in a parole revocation context that the right of confrontation is limited if the hearing officer "specifically finds good cause for not allowing confrontation."

■ Under the current procedure, the rights to confrontation, cross-examination, and presentation of favorable testimony are all preserved, though not in as broad a sense as in a full-blown criminal prosecution. The court holds that the restrictions placed on these rights are not such curtailments of these procedures as to render them violative of the concepts of minimal due process.

■ E. *Written Decision Based Solely on the Evidence with Supporting Reasons.* The "Inmate Guide" provides that "The decision of the Adjustment Committee will be based solely on the evidence presented to it at the hearing." The court concurs that such a provision is an essential element of minimal due process. As was said in Landman v. Royster, *supra,* "The practice of going outside the record in search of bases for punishment must cease." 333 F.Supp. at 653–654. Plaintiffs, relying on Morrissey v. Brewer, contend that the decision of the Committee should be report-

in all cases. For example, the "Inmate Guide" provides that the offense of "Murder of Another Inmate" may be referred to the Adjustment Committee for action; if adjudged guilty of such an offense, the prisoner may be sentenced to "segregation for the duration of his sentence or until such time as the administration deems it

feasible to release him." In such a case due process may well demand that counsel be appointed to represent an indigent prisoner before the Adjustment Committee. However, neither of the cases now before the court presents such an extraordinary situation.

ed in "a written statement by the fact-finders as to the evidence relied on." 408 U.S. at 489, 92 S.Ct. at 2604.

The evidence was not well-developed at the court's hearing into these matters as to what extent written reports of Committee actions are in fact prepared. Defendants attached to their Answer in 72–1427 a copy of a completed form entitled "Adjustment Committee Action" which was utilized in the Hearde proceedings. The form includes areas for "Inmate's Statement," "Committee Discussion," and "Disposition (Brief Explanation As To 'Why' This Decision Was Made)". Although better use of the form could have been made in the Hearde proceedings,[14] the court is of the opinion that this form, when properly completed, is a sufficient written statement to satisfy minimal due process. Certainly if there is to be any meaningful right of appeal from the Committee's decision, there must be some written record of the evidence which was presented to the Committee at the hearing.[15] There has been no evidence presented to this court to the effect that defendants are not substantially complying with this requirement.

■ F. *Review of the Decision.* The "Inmate Guide" provides a three-stage appeal procedure from an adverse Adjustment Committee decision: to the institutional warden, to the Assistant Director for Institutional Operations, and finally to the Director of the Department of Corrections. Plaintiffs contend that appellate review should be conducted by "an administrative official further removed from the scene," pref-erably someone outside the Department of Corrections, on the theory that since the higher officials in the Department work on a continuing basis with those who sit as Committee members, there exists an "unconscious bias" by the reviewing authorities in favor of the Committee's decision. This view is not appealing to the court. In Landman v. Royster, *supra,* the court specifically declined to require an appellate procedure as part of the due process rights to which a prisoner facing administrative punishment is entitled. Neither the Second Circuit in Sostre v. McGinnis, *supra,* nor the Seventh Circuit in Miller v. Twomey, *supra,* has included appellate procedure in the minimal due process guidelines specified in those decisions. As the court finds no persuasive authority that appellate review is required at all in such a situation, it must hold that the practice employed by the Department is sufficient to meet any minimal due process requirements.

■ Finally, the court turns to a consideration of under what circumstances the due process rules adopted by the Department must attach. The courts are in substantial agreement that due process must be forthcoming whenever "substantial deprivations are to be visited upon a prisoner," Sostre v. McGinnis; whenever "an individual will be 'condemned to suffer grievous loss'", Morrissey v. Brewer; whenever there are "cases involving major rules infractions for which the punishment is severe," Miller v. Twomey. In the instant actions, the court deems it sufficient to prescribe that any infractions classified

14. The area entitled "Committee Discussion" was filled in with the following statement: "Due to the evidence presented and the seriousness of the offense, the inmate was obviously was [sic] guilty."

15. Apparently the Department of Corrections recognizes the need for a written statement of the Committee's decision. In a pamphlet entitled "Uniform Correctional Policies and Procedures," published in 1972 by the Association of State Correctional Administrators as a result of a project directed by William D. Leeke, Director of the South Carolina Department of Corrections, the following statement of policy regarding disciplinary hearings appears:

"After the committee has decided that all relevant information has been brought before it, the committee should dismiss all persons except those on the committee and carefully weigh the information. Written findings of the committee should be made after deliberation is completed." Uniform Correctional Policies and Procedures at 14.

in the "Inmate Guide" as "Major Violations of Rules," for which the inmate is susceptible to punitive segregation, prolonged administrative segregation, reduction in custody status, and/or recommendation for loss of all or part of accrued good time, are "substantial deprivations" requiring the Department to afford the accused the full measure of the procedural rights specified in the "Inmate Guide" before the accused prisoner may by punished.

This court concludes that the administrative procedures for disciplining prisoners charged with major rule violations as stated in the "Inmate Guide" satisfy the minimal requirements of procedural due process under the Fourteenth Amendment. The evidence adduced at the hearing into this matter is that the plaintiff Pearson was afforded the benefit of these procedures, and his Complaint should therefore be dismissed.

However, as to the plaintiff Hearde, it is alleged by Hearde and conceded by the defendants that retained counsel was available to represent Hearde for at least one of his hearings before the Committee, but the counsel was not allowed to appear on Hearde's behalf. The "Inmate Guide" specifically provides, "If accused, you shall be permitted to have representation at the Adjustment Committee hearing." The Department obviously recognizes the beneficial role that representation plays in their administrative disciplinary proceedings. For not only does the Department employ law students as "Inmate Representatives" to appear on behalf of an accused at the hearings; evidence at the court's inquiry into these matters revealed that law students are also used in the role of "prosecutors" to present the Department's case. Having recognized the importance of "counsel substitutes" to the extent that it furnishes such representation to both sides, the Department apparently takes the position that only counsel substitutes, but not actual members of the bar, should be permitted to participate in the hearings. Such reasoning does not appeal to the court. In view of the Department's unqualified written rule that an accused "shall be permitted to have representation," the court must conclude that the Department violated its own procedural code when it failed to allow retained counsel to appear on Hearde's behalf. Thus Hearde should be granted another hearing, at which his retained counsel may represent him, or else the record of this rules infraction should be eliminated from his prison records.

As the court has concluded that the disciplinary hearing procedures set forth by the Department in its "Inmate Guide" meet minimal standards of constitutional due process, and as plaintiffs have conceded that these guidelines are substantially applied as written (with the exception of the appearance of retained counsel), the court does not believe that it is necessary or appropriate to enter any decree of injunctive relief with respect to procedures in future cases. It appears to the court that the Department is pursuing practices which are constitutionally acceptable, with the one exception noted.

The court further finds that the plaintiff Hearde in 72–1427 has failed to prove that an award of monetary damages would be appropriate in his case, see Cook v. Cox, 357 F.Supp. 120 (E.D. Va.1973); the court will order sufficient vindication of the procedural right withheld from him in 72–1296.

It is therefore ordered:

(1) That Civil Actions 72–1086 and 72–1427 are denied and dismissed;

(2) That plaintiff's prayer in 72–1296 for injunctive relief as to the class he represents is denied;

(3) That plaintiff's prayer in 72–1296 for a declaration that the present disciplinary procedures of the South Carolina Department of Corrections violate the due process of law clause of the Fourteenth Amendment to the United States Constitution is denied; and

(4) That defendants in 72–1296 shall expunge the Department of Corrections records of plaintiff Hearde of any refer-

ence to the results of the Adjustment Committee hearings of July 21 and July 28, 1973, insofar as those hearings resulted in findings adverse to that plaintiff, unless within sixty days from the date of this Order the defendants afford the plaintiff Hearde a new hearing on those charges, such hearing to comport with all the procedural safeguards set forth in the "Inmate Guide," including the right of plaintiff to be represented by retained counsel.

And it is so ordered.